## CONNER v. LONG.

1. The title to the goods of a party who is subsequently declared a bankrupt, which vests in his assignee when the assignment for which the statute provides is made, relates back to the date of filing the petition in bankruptcy, although they are then held under an attachment levied upon them within four months preceding that date.

2. When, prior to such filing, the goods so levied upon were sold under the writ and the proceeds remain in the hands of the sheriff, or, are thereafter, and before the assignment, paid by him to the attaching creditor, the title to the goods is not transferred to the assignee, but his right to the proceeds inures, and he may maintain an action therefor against the sheriff, if that officer retains them, or against the creditor, if they have been paid to him. When the goods are sold subsequently to such filing, no title passes to the purchaser, they then being the property of the assignee.

3. A., a sheriff, in obedience to an order of court, commanding him to sell certain specified goods whereon he had levied a writ of attachment issued against B., sold them, and paid the proceeds to the creditor. At the time of the order, sale, and payment, proceedings were pending wherein B. was declared a bankrupt. They had, within a few days after the levy, been commenced in another State. A. had no notice of them until after he had so paid the proceeds. *Held*, that A. is not liable to B.'s assignee for the wrongful conversion of the goods.

ERROR to the Circuit Court of the United States for the Southern District of New York.

The facts are stated in the opinion of the court.

*Mr. Robert S. Green* for the plaintiff in error.

*Mr. William B. Hornblower* and *Mr. Daniel H. Chamberlain,* contra.

MR. JUSTICE MATTHEWS delivered the opinion of the court.

The facts out of which this case has grown are undisputed. They are as follows: —

On July 20, 1875, a warrant of attachment was duly issued in an action commenced on that day in the Supreme Court of the State of New York, by Dickerson against Spaulding, a non-resident. William C. Conner, sheriff of the city and county of New York, to whom the warrant was directed, levied it, the same day, on the straw goods in controversy in this action which were at the time the property of Spaulding. On the ground that they were perishable, an order was on the 27th

of that month made in the cause, directing the sheriff to sell them. Pursuant to that order, they were sold August 1 for the sum of $1,156.50. Judgment was entered in the action September 15, in favor of the plaintiff, for $2,175.85. An execution issued thereon was received by the sheriff on that day. He returned it five days thereafter, showing that the amount made, being the proceeds of the sale less expenses, had been paid by him to the attorney of the plaintiff.

Spaulding was a resident of Massachusetts. On July 23, 1875, a petition in bankruptcy was filed against him by creditors in the District Court of the United States for the District of Massachusetts, and he was adjudged a bankrupt on the fourth day of the following September. The deed of assignment was executed by the register in bankruptcy to William H. Long, the appointed assignee, on the 21st of that month.

On Jan. 21, 1876, Long, as assignee, commenced in the Superior Court of the city of New York the present action, against Conner, the sheriff, to recover the value of the goods, on the ground that the sale so made was a wrongful conversion of property, the title to and right of possession in which had at the time, by the operation of the Bankrupt Act, become vested in him as assignee of Spaulding.

This action was removed by the plaintiff therein to the Circuit Court of the United States. The answer of Conner denied "that he knew or in any way had any notice or intimation of said alleged proceedings in bankruptcy until subsequently to such sale, and until after the payment over by this defendant of the money so received by him upon such sale, as hereinafter set forth." Upon the trial the judge instructed the jury that upon these admitted facts the sheriff was guilty of a conversion of the property in question Aug. 1, 1875, in selling it under the order of the Supreme Court of New York; that he was consequently liable to pay to the plaintiff the market value thereof on that date, with interest; and that the only question submitted for their determination was the amount of damages.

The trial resulted in a judgment for $1,186.43 in favor of the plaintiff, to reverse which this writ of error is prosecuted.

The form of the charge assumed the truth of the foregoing allegation in the defendant's answer, as to his want of actual notice of the proceedings in bankruptcy.

The question now to be considered and determined is, whether there is error in this charge.

The solution of this question depends upon the force to be given to the fourteenth section of the act of March 2, 1867, c. 176, now sect. 5044 of the Revised Statutes, which reads as follows : —

" As soon as an assignee is appointed and qualified, the judge, or when there is no opposing interest, the register shall, by an instrument under his hand, assign and convey to the assignee all the estate, real and personal, of the bankrupt, with all his deeds, books, and papers relating thereto, and such assignment shall relate back to the commencement of the proceedings in bankruptcy, and by operation of law shall vest the title to all such property and estate, both real and personal, in the assignee, although the same is then attached on mesne process as the property of the debtor, and shall dissolve any such attachment made within four months next preceding the commencement of the bankruptcy proceedings."

In *Hampton* v. *Rouse* (22 Wall. 263, 275), it was declared by Mr. Justice Clifford, delivering the opinion of the court, that the plain meaning of this section was, that, "until an assignee is appointed and qualified, and the conveyance or assignment is made to him, the title to the property, whatever it may be, remains in the bankrupt." It is equally plain that, when the assignment is made, it operates retrospectively. The title of the bankrupt in the interval is defeasible, and, when the assignment is made, is divested as of the date when the petition was filed. All titles derived under or through him, originating subsequently to that date, are, by force of law and without regard to the knowledge or the motives of the claimant, overreached and defeated. *Bank* v. *Sherman*, 101 U. S. 403. The statute declares that the title of the assignee shall thus vest by relation to the commencement of the proceedings in bankruptcy, although the property is then attached on mesne process as the property of the debtor.

It is urged in argument on behalf of the plaintiff in error

that the act divests the title of property held by virtue of an attachment only when it is so held at the date of the execution and delivery of the assignment, and not at the time of filing the petition in bankruptcy; and that, consequently, when, as in the present case, the attachment proceedings had resulted in a disposition of the goods, prior to the actual conveyance to the assignee, the title to them would not pass to him. To hold otherwise, it is said, would, in opposition to the plain provisions of the law, defeat the legitimate operation of an attachment, which had been commenced more than four months prior to the inception of the bankruptcy proceedings; for it might well be that under such a writ property might be held undisposed of at the date of filing the petition in bankruptcy. But it is equally true that property so held might remain subject to the attachment at the date of the conveyance to the assignee, and the supposed difficulty is not removed by the suggested construction of the act. It is removed, however, by considering the whole section, from which it appears that it is the title to property, subject to an attachment, only when levied within four months next preceding the commencement of the bankruptcy proceedings, which becomes vested in the assignee by relation, the same attachment being thereby dissolved as of that date.

One consequence is, that if property of the debtor levied on under such an attachment has been sold prior to the filing of the petition in bankruptcy, but thereafter the proceeds of the sale remain in the hands of the sheriff, or before the assignment have been applied to the payment of the judgment in the attachment suit, the rights of the assignee attach to the money and cannot follow the property sold; for the latter not being subject to the attachment at the commencement of the bankruptcy proceedings, the title thereto is not thereby transferred to the assignee; but the attachment being dissolved upon that event, the right to the proceeds of the sale passes under the assignment, released from the claims of all parties to the attachment suit, as of the date of the commencement of the proceedings in bankruptcy. And in such a case the plaintiff in the attachment suit, having received the proceeds of the sale on his judgment, would be liable to an action by the assignee

for that sum of money had and received to his use; or, if it remained in the hands of the sheriff, the assignee might become a party to the action, and obtain an order of the court requiring the amount to be paid directly to himself.

Another result is, that if the property has been sold under the attachment after the commencement of the bankruptcy proceedings, no title passes by the sale, for the property ceased, at that time, to be the property of the bankrupt, and became the property of the assignee, a stranger to the action and not affected by it; and both the plaintiff in the attachment and the purchaser at the sheriff's sale would be liable to the assignee for a conversion of his property, — the one for having caused its sale, the other for having taken possession of it as owner.

Upon this point there can scarcely be any diversity of opinion, for it would be difficult to give to this feature of the bankrupt law any less effect without depriving it of all substantial operation, and defeating its obvious policy. It was, undoubtedly, deemed an essential element in any efficient system, the main purpose of which was to secure to all the creditors of the bankrupt an equal participation in his effects, not only as against his fraudulent and collusive dispositions, but also as against the zealous competition among creditors, in their heedless race of diligence, to obtain priority. For this reason every title to property sought to be acquired by a seizure and sale under an attachment, belonging to one subsequently declared to be a bankrupt, is defeated, if the attachment be levied within four months next previous to the institution of the bankruptcy proceeding; and the creditor, at whose instance and for whose benefit the sale was made, and the purchaser who, having acquired possession of the property, asserts a claim of ownership, are each liable for a tortious conversion of the property of the assignee, unless, as before stated, the property has been sold under the attachment before the filing of the petition in bankruptcy, in which case the title of the assignee vests in the proceeds of sale.

In *Duffield* v. *Horton* (73 N. Y. 218), it was decided that a debtor of the bankrupt, whose obligation had been subjected to an attachment, levied within four months next preceding

the bankruptcy proceedings, was liable to the assignee, notwithstanding he, without actual knowledge of the bankruptcy, had previously paid it to the sheriff, upon a judgment rendered against the bankrupt in the attachment proceedings. In that case the court say : " The payment by the defendants to the sheriff of the debt due Yerkes was without authority, and did not discharge the obligation, either to Yerkes or the plaintiffs. The lien of the sheriff was discharged and the payment was voluntary. There was no process against the defendants or their property, neither was there any judgment or order of any court, in obedience to which the money was paid. The judgment and execution was a general judgment and execution against Yerkes, and not a judgment specifically subjecting the debt to the payment of the judgment and requiring the defendants to pay it or the sheriff to collect and apply it."

In the course of the same decision the New York Court of Appeals intimates an opinion that "the sheriff could not probably be sued, being an officer of the court, and receiving the money as such ; " and cites in support of it the cases of *Johnson* v. *Bishop*, 1 Woolw. 324, and *Bradley* v. *Frost*, 3 Dill. 457.

The former of these cases — *Johnson* v. *Bishop* (*supra*) — was an action of detinue, brought by the assignee of Loeb, a bankrupt, to recover possession of goods attached and held by the sheriff as the property of Loeb & Co., of which firm Loeb was the sole member. The attachment suit had been brought in a State court of Iowa, and the action of the assignee in the District Court of the United States for that district. The District Court had dismissed the cause for want of jurisdiction, and the assignee prosecuted a writ of error to the Circuit Court. It was admitted in the opinion of that court, delivered by Mr. Justice Miller, that, on the facts alleged, the title to the goods vested in the assignee as soon as the assignment was executed, and with that title he acquired a right of immediate possession ; but it was held that he must apply to the State court for the recognition and enforcement of his rights, or, waiting till the sheriff had parted with the possession, prosecute a party who could not shelter himself behind the jurisdiction of a court of law, and that he could not maintain an action against the sheriff for the recovery of the possession of the property, and

damages for its detention. "The property," it was said, "is held by the sheriff under writs rightfully issued, and his possession is the possession of the court by the command of whose writ he seizes it. And so long as the proceedings in virtue of which it was taken are pending, that possession will not be interfered with by any other court."

In answer to the argument that the bankruptcy proceedings operated to discharge the attachment at once, without any order in that behalf, so that the sheriff was left without any authority to hold the property, the opinion proceeds as follows: "It may be true that the attachments have ceased to have any binding force. But whether they have or not is the question; and this question depends, not only upon a proposition of law here urged upon us, but also upon two questions of fact: that is, whether Loeb has been adjudicated a bankrupt, and whether he was the only member of the firm of Loeb & Company. Of the principle of law the State court is bound to take judicial notice; but of the two facts stated, it is not bound to take such notice. No court is bound to take judicial notice of the proceedings of another court. If material to a controversy before it, it must be informed thereof by the pleadings; and if the allegations are denied, they must be proven by the record. The State court can have no knowledge or even notice of the proceedings in the Federal court, by which its right to possess and adjudicate the property in question is affected. It should be informed in a proper way of those proceedings, before its possession is interfered with or assailed." p. 328. And in support of this conclusion reliance was had upon the cases of *Hagan* v. *Lucas,* 10 Pet. 400; *Pulliam* v. *Osborne,* 17 How. 471; *Taylor* v. *Carryl,* 20 id. 583; *Freeman* v. *Howe,* 24 id. 450; *Ex parte Dorr,* 3 id. 103; and *Buck* v. *Colbath,* 3 Wall. 334.

The principle of this decision was expressed in the opinion of the court in the case of *Doe* v. *Childress* (21 Wall. 642), in which Mr. Justice Hunt said: "Where the power of a State court to proceed in a suit is subject to be impeached, it cannot be done except upon an intervention by the assignee, who shall state the facts and make the proof necessary to terminate such jurisdiction;" and adding: "This rule gains, whether

the four months' principle is applicable, or whether it is not applicable."

The case of *Johnson* v. *Bishop* (*supra*), however, does not decide the question now before us, whether, after the State court has exhausted its jurisdiction over the attached property, the sheriff, as well as the plaintiff and the purchaser, may not be proceeded against for a conversion of the property at the suit of the assignee, who at the time of the sale had become in law its owner.

*Bradley* v. *Frost* (*supra*) was such an action, not distinguishable in its circumstances from the present; and in that the circuit judge, upon the principle decided in *Johnson* v. *Bishop*, held that the sheriff was not liable, but not without expressing doubt of the correctness of his decision. The ground of his judgment was, that the property levied on under the attachment was at the time the acknowledged property of the debtor, and thereby came into the lawful possession of the court, was held by the sheriff as its officer, and sold by him in obedience to a command directing him to sell, not generally, as in case of an ordinary execution upon a personal judgment, the property of the judgment debtor, but specifically, the very property in the custody of the court, and upon which it acted *in rem*.

The case is thus brought within the terms of the first of the two classes of legal process described in *Buck* v. *Colbath* (*supra*), "those in which the process or order of the court describes the property to be seized, and which contain a direct command to the officer to take possession of that particular property," — the sale being substituted for the seizure, — in respect to which, it is said, "he has no discretion to use, no judgment to exercise, no duty to perform, but to seize the property described;" and from which, it is added, it follows, "as a rule of law of universal application, that if the court issuing the process had jurisdiction in the case before it to issue that process, and it was a valid process when placed in the officer's hands, and that in the execution of such process he kept himself strictly within the mandatory clause of the process, then such writ or process is a complete protection to him, not only in the court which issued it, but in all other courts." p. 343.

On the other hand, in the case of those writs "in which the officer is directed to levy the process upon property of one of the parties to the litigation, sufficient to satisfy the demand against him, without describing any specific property to be thus taken," it is declared, in the same opinion (p. 344), that "the officer has a very large and important field for the exercise of his judgment and discretion. *First*, in ascertaining that the property on which he proposes to levy is the property of the person against whom the writ is directed; *secondly*, that it is property which by law is subject to be taken under the writ; and, *thirdly*, as to the quantity of such property necessary to be seized in the case in hand. In all these particulars he is bound to exercise his own judgment, and is legally responsible to any person for the consequences of any error or mistake in its exercise to his prejudice. He is so liable to plaintiff, to defendant, or to any third person whom his erroneous action in the premises may injure." And "the court can afford him no protection against the parties so injured; for the court is in nowise responsible for the manner in which he exercises that discretion which the law reposes in him, and in no one else."

It is manifest that the act of the sheriff, for which he is sought to be charged in the present action, is not within the rule established as to the latter class of cases; for he neither had nor exercised any discretion in making the sale, and, doing only what he was specifically and in terms commanded to do by the order of the court, the court is responsible for his obedience.

It is argued, however, that the proceedings in bankruptcy, prior to the sale, had the effect of ousting the jurisdiction of the State court in the attachment suit, so that thereafter its order to sell was a nullity, incapable in law of any effect, and, therefore, incompetent to protect the officer against the consequences of executing it. But if the jurisdiction of the court became vacated, in the sense that after the assignment in bankruptcy its action was void, in respect of all persons and for all purposes, then it also follows that it thereby lost the legal custody of the attached property, and the sheriff held it afterwards, not officially, but merely as a private person; and he could not, consequently, defend against an action of

replevin,. brought by the assignee to recover. possession of the specific property. This conclusion, upon the principles and authorities already referred to, we have already excluded; but the same reasoning would support the defence of the officer, in an action for a conversion. of the property sold in obedience to the order of the court, and, therefore, not by him, but by the court itself. Otherwise, the judge who made the order would be equally liable for the tort with the sheriff who executed it.

It is true, ordinarily, and .in the case of private persons acting voluntarily, that in case of a conversion of the goods. of another, in which both principal and agent are concerned, both are severally liable, and the servant cannot justify under orders from a master; for, as was said by Lord Ellenborough in *Stephens* v. *Elwall* (4 Mau. & Sel. 259), " a person is guilty of a conversion who intermeddles with my property, and disposes of it, and it is no answer that he acted under authority from another, who had himself no authority to dispose of it."

But this rule has its limitations, and does not apply even in cases of private persons exercising a public employment, when the act complained of is in the discharge of a duty to the public incident thereto: as in *Greenway* v. *Fisher* (1 Car. & P. 190), where the defence was that the defendant, who was a common carrier, had merely shipped the goods in the ordinary course of business, Abbott, C. J., said: " The distinction between this case and that of a servant is, that here there is a public employment; and as to a carrier, if, while he has the goods, there be a demand and a refusal, trover will lie; but while he is the mere conduit-pipe in the course of trade, I think he is not liable."

And such undoubtedly is the law. The reason and policy of it apply with even greater force to a person acting in an official capacity, such as. a sheriff, where the act, for the consequences of which it is sought to make him liable, is the direct and express command of a court, whose precepts he is under the highest obligation to obey without question and without hesitation.

The rule of duty and of liability is thus stated with admira-

ble force by Hosmer, C. J., in *Watson* v. *Watson* (9 Conn. 140, 146) : " Obedience to all precepts committed to him to be served is the first, second, and third part of his duty ; and hence, if they issue from competent authority, and with legal regularity, and so appear on their face, he is justified for every action of his, within the scope of their command." The action in that case was replevin, and the following extract from the same opinion is pertinent to the present inquiry. The learned judge said : " It was said in the argument of this case, that no difference exists, as to the proceedings of an officer, if the plaintiff has no property in the goods to be replevied, between the taking of property on a replevin, and the taking of the goods of *A.*, upon a process commanding him to take the goods of *B.* ; that is, the caption in both cases is equally a trespass. No remark can be more unfounded, for the difference is immense and distinctly marked. *In the case of the replevin, the officer does what by legal authority he is commanded to do ; and in the other case, he does what he was not commanded to do.* In replevin, the property is identified and described, and the command is, *Take this specific property.* In the case of a process commanding the taking of the goods of *A.*, without any identification or description, the command is, *Take the goods of A., if any such there are, but not the goods of any other person.* From the nature of the case last put, the officer must act on his own inquiry, and is bound to all the responsibility of his action." p. 147.

So, in *Savacool* v. *Boughton* (5 Wend. (N. Y.) 170), the rule was, as we think, correctly stated by Marcy, J., that if the subject-matter of a suit is within the jurisdiction of a court, but there is a want of jurisdiction arising from some other cause, for example, as to the person or place, the officer who executes process issued on such suit is no trespasser, unless the want of jurisdiction appears by such process.

The same rule was sustained by Nelson, C. J., in *Webber* v. *Gay*, 24 id. 485. In *Wilmarth* v. *Burt* (7 Metc. (Mass.) 257, 259), Shaw, C. J., said : " As a general rule, the officer is bound only to see that the process, which he is called upon to execute, is in due and regular form, and issues from a court having jurisdiction of the subject. In such case he is justified

in obeying his precept, and it is highly necessary to the due, prompt, and energetic execution of the commands of the law that he should be so."

To the same effect are *Twitchell* v. *Shaw* (10 Cush. (Mass.) 46), and *Clarke* v. *May*, 2 Gray (Mass.), 410. The same principle was applied to the proceedings of a court-martial, by this court, in *Dynes* v. *Hoover*, 20 How. 65.

In the present case it is admitted that the State court had full and perfect jurisdiction, in all respects, until it was terminated by the proceedings in bankruptcy. But the fact that put an end to its jurisdiction did not appear by its own record, and consequently was one of which the sheriff could not, by legal possibility, have official notice; and without that, he was bound to obey the order of that court, to whom he was responsible, directing the sale of the property, which, so far as he was concerned, at the time it was made, was an exercise of jurisdiction as legitimate as the issuing of the original attachment under which the property had been lawfully taken and held. Indeed, the general rule is, that where an attachment has been dissolved, no action can be maintained against the sheriff for a return of the property, until he have notice by the record of the fact; or if it has taken place, by the act of the parties, *dehors* the record, then not until notice of the extrinsic facts, which have satisfied it, has been brought home to him. Drake, Attachments, sect. 426; *Livingston* v. *Smith*, 5 Pet. 90.

These considerations, leading to the exoneration of the sheriff from the responsibility sought to be imposed upon him in such cases, derive additional force from the circumstance that the transaction which is supposed to entail liability upon him not only operates retrospectively, but occurred in a different jurisdiction, to which he was not responsible. The proceedings in bankruptcy were had in a court of the United States sitting in the district of Massachusetts. The defendant below was sheriff of a court of the State of New York. It is entirely true that the act of Congress prescribing a uniform rule as to bankruptcies, passed in pursuance of an express grant of power in the Constitution of the United States, is the paramount law throughout the territorial jurisdiction of the national govern-

ment. · It is as truly the law of each State, as it is, and because it is, a law of the United States. · The assignment in bankruptcy made in one district, so far as its operation is matter of law, operates with the same effect in all districts. And it operates upon the title to the property of the bankrupt wherever it is situate, so as to preserve it, according to the provisions of the act, for distribution under it, and so that the title shall pass, as it requires, without regard to any dealing with it, which it forbids. Whatever hardship, if any, may follow to private persons who sell or buy it, and attempt to divert it to their own use, falls upon them, as in other cases, where titles fail, even in the hands of innocent, because ignorant, purchasers. But they are volunteers, seeking only their private interests, and take the chances of all the consequences of their conduct. The maxim to which they are subject is "*caveat emptor.*" It is not so with the sheriff, who, as a public officer of the court, obeys its precepts, regular on their face, without notice of any want or failure of jurisdiction; who is not at liberty to exercise any discretion, and has no choice but to obey. The language of Mr. Justice Miller in delivering the opinion of this court in *Eyster* v. *Gaff* (91 U. S. 521, 524), though spoken in reference to a different state of facts, is applicable to the present case. "It is a mistake," he said, "to suppose that the bankrupt law avoids of its own force all judicial proceedings in the State or other courts the instant one of the parties is adjudged a bankrupt. There is nothing in the act which sanctions such a proposition. The court, in the case before us, had acquired jurisdiction of the parties and of the subject-matter of the suit. . . . It could not take judicial notice of the proceedings in bankruptcy in another court, however seriously they might have affected the rights of the parties to the suit already pending."

There is no language in the Bankrupt Act that, either expressly or by any necessary implication, requires us to hold the officer liable in such circumstances; nor is its policy defeated or thwarted by refusing to do so. The opposite conclusion is based upon an inference from the doctrines relating to the conversion of personal property, and, in our opinion, is the result of a misapplication of the principle invoked.

The court below took a different view of the law, following a prior decision in the same circuit in *Miller* v. *O'Brien* (9 Blatchf. 270), in which the circuit judge, Woodruff, said: "It accords with our sense of justice to say that they [sheriffs] ought not to be held liable for their acts in the execution of process, done in good faith, without actual notice of any proceedings in bankruptcy against the debtor." He nevertheless felt constrained to adopt "the reasoning and the principles upon which the same question was settled in England under the bankrupt law of that country," referring to *Balme* v. *Hutton* (9 Bing. 471), and *Garland* v. *Carlisle*, 4 Cl. & Fin. 693.

And these cases have been pressed upon us in this argument as authorities entitled to be followed. They are entitled, certainly, to very respectful examination.

The principal case in England is that of *Cooper* v. *Chitty* (1 Burr. 20), decided by Lord Mansfield in 1756. It arose, as did all the subsequent cases, under the Bankrupt Act of 13 Eliz., c. 7, which, after authorizing the appointment of commissioners for managing and disposing of the bankrupt's estate, enacted that every direction, order, bargain, sale, and other thing done by the persons so authorized, shall be good and effectual in the law against the said offender or offenders, debtor or debtors, &c., and *against all other person or persons claiming by, from, or under such offender or offenders, debtor or debtors, by any act or acts had, made, or done after any such persons shall become bankrupt.* The action was trover against the sheriffs of London by the assignees of a bankrupt to recover the value of goods levied on and sold under an execution upon a judgment recovered against the bankrupt, the goods having been seized after an act of bankruptcy, and sold after the assignment was executed. The officers were adjudged liable for a conversion. It appears from the report of the arguments and judgment that in no prior case had the sheriff been held liable in such circumstances, and several were cited to the contrary. These Lord Mansfield either distinguished from the case before him, or overruled as without authority; and, in answer to the argument of hardship to the officers, laid stress upon the fact, that in the case before him the sheriffs knew of the bankruptcy before they sold the goods.

Lord Mansfield's decision in that case controlled the course of judicial opinion upon the question until *Balme* v. *Hutton* (2 Cromp. & J. 19) was decided in the Court of Exchequer in 1831. In the course of his opinion in that case, Lord Lyndhurst said: " The sheriff does not act of his own accord or for his own benefit; he acts as a ministerial officer in execution of the command he receives from a court of justice in the King's name; and if what he does is, *at the time he does it*, in strict obedience to that command; if it be what the court itself, if it could itself have acted, would have done; and if it be *at that time* justifiable by the writ under which he acts, — it is a strong measure to say that subsequent events shall make that a wrongful act in the sheriff which, at the time he did it, was rightful, and shall make him answerable as a *wrong-doer* for what, at the time he did it, it was *his duty to do*." He also showed, by an elaborate review of the earlier authorities, that in such a case the sheriff had been uniformly protected by his process, and concluded that *Cooper* v. *Chitty* decided only that a sale by the sheriff, *with notice of the bankruptcy*, was a wrongful conversion by the sheriff, and a sufficient foundation for an action of trover; but that it left the case of the sheriff, upon a sale *without notice*, as much protected as before. He then proceeded to show that the subsequent decisions had overlooked the distinction on which *Cooper* v. *Chitty* was founded, and were a departure from the true rule as established by the earlier authorities, and gave judgment for the defendant. But this judgment was reversed in 1833 by the Court of Exchequer Chamber. *Balme* v. *Hutton*, 1 Cromp. & M. 262.

The question came finally before the House of Lords in the year 1837, in the case of *Garland* v. *Carlisle* (4 Cl. & Fin. 693), where it was settled by a decision against the sheriff, who, before the passing of the 6 Geo. IV., c. 16, having no notice of a previous act of bankruptcy committed by a trader, seized his goods under a *fi. fa.*, but withdrew upon an arrangement entered into between the execution creditor and the trader, receiving his poundage in the ordinary manner. A commission was afterwards issued on this act of bankruptcy, and it was held that the assignees might maintain trover

against the sheriff for the goods seized, the receipt of poundage being considered evidence of a conversion by the sheriff. The judges were called upon for their opinions, and the majority, who gave opinions against the sheriff, relied largely upon the language of 13 Eliz., c. 7, and upon the settled course of decision, which it was thought to be inexpedient to reverse.

Mr. Justice Vaughan, one of the minority judges, in stating the ground of his opinion, said (p. 771) : " Being, therefore, of opinion that there is no legislative enactment by which the sheriff is rendered expressly liable, but assuming, for the sake of argument, that the general terms in which the clauses to which I have referred are expressed, may be thought so large as to be of *universal* application, and consequently to comprehend the sheriff, I think, for the reasons I have stated, that the law would imply an exception in his favor, arising out of his official character and duty, being an officer of justice *compelled* by stern necessity to execute the King's writ, ' *Necessitas, quidquid coegit defendit.*' "

The final judgment was given against the sheriff. Great stress was put upon the long-established series of decisions to that effect. Lord Brougham, although concurring, said : " I may say, however, that I agree particularly with one of the learned judges, Mr. Justice Coltman, in his expression of opinion, that had the case been an entirely new case, and now to be decided for the first time, I might have come to a different conclusion upon it; but that as it is, a whole current of decision unbroken for so many years, from 1756 to 1831, has disposed of the question, and we are not now left at liberty to form an opinion upon it. I do not, however, think that *Cooper* v. *Chitty* absolutely decided this question, though it certainly decided the principle. The more that case is examined, the less, as it appears to me, will it be found to have decided the question, if, indeed, it does not rather operate as an argument against the side for which it is now quoted." Lord Denman dissented.

The question is now a new one in this court, and we are not fettered by an inveterate course of decisions upon it. We are at liberty, in view of all appropriate considerations, to decide it upon reason and not by precedent. And we are satisfied,

upon grounds already stated, that in doing so we shall reach conclusions entirely satisfactory, and supported, as we believe, by recognized principles of law. It is a sufficient reason, in our judgment, for not following the English decisions, that in 1839, shortly after the House of Lords had declared its inability to disregard the course of previous decision, Parliament, recognizing the injustice and inexpediency of the rule thus finally established judicially, interposed by the act of 2 & 3 Vict., c. 29, and by several successive acts, which had the effect to protect the sheriff in the performance of his official duty against such actions as the present. Indeed, some relief had been introduced by the Bankrupt Act of 6 Geo. IV., c. 16, passed in 1825. *Edwards* v. *Scarsbrook*, 3 B. & S. 280; *Slater* v. *Pinder*, Law Rep. 6 Ex. 228. This legislation we regard as evidence of the highest character that the rule in question ought never to have been judicially established. Its effect was not so much to change as to restore the law. It was in fact a legislative reversal of the judgment of the House of Lords. It cannot be assumed that Congress intended, in the Bankrupt Act of 1867, to restore a rule of liability which had become obsolete in England nearly thirty years before.

In our opinion, the judgment below should have been for the plaintiff in error; and it is, therefore, reversed.

The cause will be remanded, with instructions to grant a new trial; and it is

*So ordered.*