NEW-YORK,
Nov. 1810.

BRISTOL
v.
BURT.

*Gold,* contra, cited 1 *Caines' Rep.* 358.   2 *Caines' Rep.* 183.

---

## BRISTOL *against* BURT.

To constitute a conversion sufficient to support trover, it is not necessary to show a manual taking of the thing in question ; nor that the defendant has applied it to his own use ; but theassuming the right to dispose of it, or exercising a dominion over it, to the exclusion,or in defianceof the plaintiff's right, is a *conversion.*.

THIS was an action of *trover,* brought to recover the value of 95 barrels of potashes.   The cause was tried at the *Onondaga* circuit, the 7th *June,* 1810, before the *Chief Justice.*

The defendant was, in 1808, and still is, the *collector* of the port of *Oswego,* on the south side of lake *Ontario.*   In *May,* 1808, the defendant was applied to, to know whether he would grant clearances for ashes for the port of *Sackett's Harbour,* which is the next adjoining port in the county of *Jefferson,* and on the south side of the lake, and adjacent to the province of *Canada.* The defendant answered that he did and should continue to grant clearances ; and the defendant was informed of the intention of the plaintiff to bring ashes to *Oswego,* for the purpose of sending them to *Sackett's Harbour.*   About the first *July,* the plaintiff sent 95 barrels of potashes to *Oswego,* which were put into the

6

store of a Mr. *Wentworth*, who gave the plaintiff a receipt for them. The plaintiff applied to the defendant for a clearance, in order to transport the ashes to *Sackett's Harbour;* but the defendant refused to grant it, alleging as a reason for his refusal, that though he did not suspect the plaintiff intended to send the ashes to a *British* port, yet he believed that the collector at *Sackett's Harbour* would not do his duty, and that the ashes would be sent from thence to a *British* port. The defendant at the same time promised the plaintiff, that if he did not receive instructions to the contrary from the secretary of the treasury, within a fortnight, he would give a clearance to the plaintiff's ashes. After the expiration of that time, the defendant still refused to grant the clearance, though he admitted that he had received no new instructions from the secretary of the treasury, nor had he received any instructions forbidding such clearances. He assigned no other reason for his refusal, than his suspicion that the collector at *Sackett's Harbour* would not do his duty, and persisted in refusing a clearance, though the plaintiff offered to give bonds that the ashes should be delivered at *Sackett's Harbour*. The plaintiff then expressed his desire to take the ashes *up the river;* but the defendant declared that the plaintiff should not take them from *Wentworth's* store, unless he gave bonds for double the value of the property, to carry the ashes to *Rome*, in the county of *Oneida*, and leave them there, while the embargo continued; that the property was under his jurisdiction and charge; that he had a control over all the stores and wharves where ashes were placed, and had employed armed men; and that he had the right to prevent their removal, and would exercise it. Two armed men were stationed near *Wentworth's* store during two nights, and an armed *sentinel* was constantly on duty, night and day, at the public store of the collector,

within ten rods of *Wentworth's* store, and in view of it, for the purpose of observing boats, and preventing the removal of property. The defendant avowed his determination not to permit any ashes to be removed from any of the stores in *Oswego.* The defendant demanded the ashes in question from *Wentworth,* who refused to deliver them; but in order to prevent the defendant from proceeding to extremities, and to satisfy him, *Wentworth* entered into an agreement with the defendant, not to deliver any property from his store, without the permission of the defendant.

In the autumn of 1808, the defendant gave a general permission to remove any ashes from *Oswego* up the river, and 13 barrels of the potash of the plaintiff, were delivered by *Wentworth* to his order.

On the 13th *February,* 1809, the defendant gave a written permit to carry the remaining 82 barrels of potashes from *Oswego* to *Rome,* in the county of *Oneida,* requiring of the person to whom they were delivered by order of the plaintiff, a written report of the ashes, and an oath that the statement was true, and that he did not intend to violate the law.

It was proved, that when the plaintiff applied to the defendant for a clearance to *Sackett's Harbour,* potashes were worth at that place 180 dollars per ton, and that the expense of transportation was 4 dollars per ton. That the price of potashes on the 21st *July,* 1808, in the city of *New-York,* was 173 dollars per ton, but would not sell at *Salina,* in the county of *Onondaga,* for more than 150 dollars. That when the plaintiff received the ashes, the price of them, in the city of *Albany,* was 137 dollars and 50 cents, and the expense of transportation from 25 to 30 dollars per ton.

The *Chief Justice* charged the jury, that in his opinion, there was sufficient evidence of a conversion by the defendant, and that the plaintiff was entitled to re-

cover for the difference in the value of the ashes at the <span style="float:right">NEW-YORK, Nov. 1810.</span> time when he demanded a clearance, and at the time he received them. And the jury found a verdict for <span style="float:right">BRISTOL v. BURT.</span> the plaintiff, for 1,472 dollars and 20 cents.

A case was made for the opinion of the court, which it was agreed might be turned into a special verdict.

*Gold,* for the plaintiff, cited 6 *East,* 538. 6 *Term Rep.* 298. 1 *Burr.* 31.

*Cady,* contra, cited 5 *Bac. Abr.* 279. *Trover,* (G.) *Bull. N. P.* 44. 3 *Salk.* 284.

*Per Curiam.* The only point made in this case is, whether there was sufficient evidence of a conversion to justify the verdict.

There were declarations and acts of the defendant united to form a control over the plaintiff's property. The very denial of goods to him that has a right to demand them, says Lord *Holt,* in *Baldwin* v. *Cole,* (6 *Mod.* 212.) is a conversion; for what is a conversion but an assuming upon one's self the property and right of disposing of another's goods? And he that takes upon himself to detain another man's goods from him without a cause, takes upon himse the right of disposing of them. The bare denial to deliver is not always a conversion, as in *Thimblethorpe's* case, (cited in 2 *Bulst.* 310. 314.) where a piece of timber was left upon the land of the defendant by the lessee at the expiration of his term, and he was requested to deliver it and refused, but suffered the timber to lie without intermeddling with it. The reason why this was held not to be a conversion was, that there was no *act* done or dominion exercised; but in the present case there were the highest and most unequivocal acts of dominion and control over the property; not only by claiming jurisdiction over it, but in placing armed men near it, to prevent its removal. This fact is, of

itself, a conversion. It is intermeddling with the property in the most decisive manner, and detaining it for months in the storehouse. It was therefore bringing a charge upon the plaintiff; and this, says Mr. Justice *Buller*, in *Syeds v. Hay*, (4 *Term Rep.* 260.) amounts to a conversion. Neither the case of *M'Combie* v. *Davies*, (6 *East*, 538.) nor the *anonymous* case in 12 *Mod.* 344. were so strong as this, and yet the conversion was maintained. It was assuming the dominion of the property which was made by Lord *Ellenborough* the test of the conversion, though the property in that case lay not in the defendant's, but in the king's warehouse. The definition of a conversion in trover, as given by Mr. *Gwillim*, the editor of *Bacon*, and now a judge in *India*, applies precisely to this case. (6 *Bac. Abr.* 677.) " The action being founded upon a conjunct right of property and possession, any act of the defendant," says he, " which negatives, or is in consistent with such right, amounts in law to a conversion. It is not necessary to a conversion that there should be a manual taking of the thing in question by the defendant; it is not necessary that it should be shown that he has applied it to his own use. Does he exercise a dominion over it in exclusion, or in defiance of the plaintiff's right ? If he does, that is, in law, a conversion, be it for his own or another person's use."

We are, therefore, of opinion, that the motion to set aside the verdict must be denied.

Motion denied.

## A. KENT *against* WELCH.

THIS was an action of covenant. The declaration stated, that by a deed, dated the 3d of *March*, 1784, and

In an action on a covenant contained in a deed by which the grantor "*gave, granted,*" &c. and engaged to *warrant* and defend the land against all claims, &c. it was held, that no action could be maintained either on the implied or express covenant, without alleging and proving an eviction; and that the express warranty qualified and restrained any implied covenant of seisin arising from the word *give*.