YONE SUZUKI and Others, Copartners Doing Business under the Name and Style of SUZUKI & COMPANY, Respondents, *v.* FREDERICK B. SMALL, as President of the AMERICAN EXPRESS COMPANY, Appellant.

First Department, December 4, 1925.

Conversion — action to recover for steel plates alleged to have been converted by defendant — defendant was employed by another shipper of steel plates to arrange for shipments from Seattle to Japan — steel in question was, through defendant's error, directed to be and was shipped to defendant's employer — defendant is guilty of conversion regardless of intent — damages whether fixed at market value in Seattle or Japan exceeded amount of verdict — error in measure of damages is harmless — plaintiff is entitled to interest.

The defendant, who was engaged by a Japanese shipper of steel plates to arrange for shipments from Seattle to Japan, is guilty of conversion of steel plates

belonging to the plaintiff which were in Seattle at the same time as plates belonging to the defendant's employer, since it appears that the defendant, through error, directed that the steel plates belonging to the plaintiff be shipped to, and they were shipped to defendant's employer in Japan, and the plaintiff never received them.

It is immaterial that the defendant was acting as agent and did not intend to convert plaintiff's property or did not actually have it in its possession, for intent is not an element of conversion, and it is sufficient to constitute conversion if dominion is exercised over the property converted.

Since the damages awarded by the jury were less than the market value of the steel in Seattle or in Japan, any error committed in fixing the measure of damages is harmless.

The plaintiff is entitled to interest on the value of the property from the time it was converted.

APPEAL by the defendant, Frederick B. Small, as president of the American Express Company, from a judgment of the Supreme Court in favor of the plaintiffs, entered in the office of the clerk of the county of New York on the 24th day of January, 1925, upon a verdict rendered by direction of the court at the New York Trial Term pursuant to a stipulation that the action be tried without a jury and that a verdict be directed with the same force and effect as though a jury were present, and also from an order entered in said clerk's office denying defendant's motion for a new trial made upon the minutes.

*Carter, Ledyard & Milburn* [*John G. Milburn, Jr.*, of counsel; *Henry Hill Anderson* with him on the brief], for the appellant.

*Hunt, Hill & Betts* [*Leavitt J. Hunt* of counsel; *John W. Crandall* with him on the brief], for the respondents.

BURR, J.:

The action is for conversion. The complaint alleges that the plaintiffs on or about September 19, 1917, were the owners of and entitled to the possession of 161 steel plates weighing about 157.9 tons; that on or about the 22d of November, 1917, said plates were in cars marked B. R. P. 17214, P. & R. 880730 and B. & O. 148928; that said cars containing the said plates were in the possession of the Oregon-Washington Railroad and Navigation Company, as common carrier in or about the city of Seattle, State of Washington; that said plates were transferred to cars marked U. P. 84136, U. P. 91013, and P. A. 282402, in or about Seattle; that on or about the 30th day of August, 1918, the defendant wrongfully took said steel plates from the Oregon-Washington Railroad and Navigation Company, well knowing that said plates were the property of plaintiffs and wrongfully converted and disposed of the same to his own use; that defendant failed to

deliver to the plaintiffs such plates or any part of them, or the value thereof, although due demand had been made therefor; that said plates were of special and particular value and were manufactured and purchased for shipbuilding purposes, were in great demand and were of the value of $73,423.50.

The answer denied any knowledge or information sufficient to form a belief as to any of the allegations in the complaint except that it denied upon information and belief that the plates referred to in the complaint were at any time in the possession of the said defendant or that the defendant converted the same.

During 1917 and 1918 the plaintiffs and the Nippon Kisen Kaisha and other concerns were purchasing steel in the eastern part of the United States and exporting the same to Japan, via Seattle, Wash., so that during the month of August, 1918, plaintiffs had in the railroad company's yards at Seattle certain carloads of steel awaiting shipment to Japan, among which were the three for the alleged conversion of which this suit is brought.

The Nippon Kisen Kaisha, hereafter referred to as the N. K. K., purchased steel plates for ship construction from mills in Pennsylvania, and shipped them by inland domestic bills of lading to Seattle, *en route* to Japan. The steel was shipped in the following manner: The N. K. K. bought the steel in the east and some was consigned to the order of the shipper and some to the order of Kimma Fukushima, one of the representatives of the N. K. K. The bills of lading were made to the order of the shipper, being properly indorsed to the N. K. K.

The three cars of steel in question were shipped to Seattle, Wash., and consigned to the plaintiffs in car Nos. B. R. P. 17214; P. & R. 880730 and B. & O. 148928. Upon arriving at Seattle these cars were unloaded in or near the Argo yards of the Oregon-Washington railroad and put in ground storage and entered upon the railroad company's register under the heading " Consignee and Destination," " O /n N. K. K." The steel remained where so placed in " ground storage " until on or about August 12, 1918, when it was reloaded from ground storage by Oregon-Washington railroad employees into three gondola cars, as follows:

Car No. B. R. P. 17214 was reloaded from ground storage into car U. P. No. 91013; car No. P. & R. 880730 was reloaded from ground storage into U. P. car 84136, and car B. & O. 148928 was reloaded from ground storage in P. A. car 282402.

These cars remained in or near the Argo yards, in the southerly part of the city of Seattle, until on or about August fifteenth, when they were switched to the Interbay yards. The Interbay yards are on the northerly side of the city of Seattle and adjoin

Smith's Cove, where the steamship dock is located. On or about August twenty-eighth the cars were again switched from their position in the Interbay yards to the dock alongside which the steamer lay, and on August twenty-ninth and thirtieth the steel was loaded directly from the cars into the steamship *Taiyo Maru* of the Mitsui Line, by the ship's tackle. The steamer carried the steel to Japan, arriving there in due course in the month of September, 1918. It is admitted that the steel was delivered to the Nippon Kisen Kaisha in Japan. Plaintiffs never received it.

While the shipments of steel bought by the N. K. K. in the east were in transit to Seattle, the defendant was employed by the N. K. K. as a brokerage or shipping agent in Seattle, its duties being to arrange or negotiate for shipment of the N. K. K. steel from Seattle to Japan and to report the clearances of the steamers carrying the same.

In the course of the defendant's employment, defendant made arrangements with Griffiths & Sons, agents for the Mitsui Line of steamers plying between Seattle and Kobe, Japan, for steamer space. These arrangements were evidenced by two contracts (known as contracts 609 and 610) signed as follows: " James Griffiths & Sons, A. J. Chalmers, Traffic Manager. Accepted by Kimma Fukushima, United States representative of owners by F. R. Erickson, Attorney, by telegraphic authority." (Erickson being the person in charge of defendant's office in Seattle.)

After the steel ordered by the N. K. K. in the east had been shipped to Seattle, the defendant received from the N. K. K. lists of the numbers of the cars in which the steel was loaded and shipped from the mills. These lists are known as lists 1, 2 and 3, and were put in evidence. These lists were forwarded by defendant's New York office to defendant's Seattle office. Defendant thereafter furnished copies of these lists to Griffiths & Sons with instructions as to the order in which the cars were to be called for, and other copies were furnished to the Oregon and Washington Railroad and Navigation Company.

It appears that nearly all the N. K. K. steel upon its arrival in Seattle was put in ground storage by the railroad, that is, it was unloaded from the cars in which it arrived and placed in piles upon the ground alongside of the tracks, each pile being marked by painting the number of the car on the top plate or placing the number of the car upon a stake placed in the ground alongside of the pile. It also appears when this steel arrived and was placed in ground storage, the railroad company had steel in ground storage belonging to various other shippers, including the plaintiffs.

Griffiths & Sons, the agents for the Mitsui Line of steamers,

as they required steel belonging to the N. K. K. for cargo space, would make up what was known as a line-up or call-for cargo, which contained the numbers of the cars which it required from the railroad and send same to the railroad who had this steel on hand. Upon receipt of the line-up the railroad would examine its records to see if the steel called for was on hand and if so, reload same into cars and forward same alongside of steamer.

On July 31, 1918, Griffiths & Sons prepared a line-up for the steamship *Shingo Maru* calling for nine cars of N. K. K. steel, being the last or nearly the last of the N. K. K. consignment and delivered the same to the Oregon and Washington railroad. The numbers of these nine cars appeared upon the "line-up." These numbers were taken from the lists containing the original numbers of the cars which lists 1, 2 and 3 had been previously furnished to Griffiths & Sons and the railroad by defendant. The numbers of plaintiffs' cars did not appear upon such lists. This line-up in due course of business came for attention to Miss Freedman, who was employed by the railroad as assistant to the traffic manager. This line-up was delivered by Griffiths & Sons to the railroad company to secure the adequate number of cars to load the ship. The railroad company through Miss Freedman on receiving the line-up proceeded to allot the requisite number of cars to the steamship *Shingo Maru.* She went to the car register of the railroad company and prepared and issued the following order to Jack St. Onge, an employee of the railroad company who was in charge of reloading cars in the storage yards.

"SEATTLE WHARF 8/9/18.

" J. L. ST. ONGE:

" Please reload the following cars P. A. 880730 Seattle steel, Seattle; N. C. R. 21790 Seattle steel, Seattle; N. Y. C. 348663, not on ground; B. R. P. 1724, Seattle; I. C. 125335, Seattle; B. & O. 148928, Seattle.

"N. P. SHINGO, H. L. HUDSON, F."

St. Onge complied with the order and reported as follows:

"8/12/18.

" Mr. H. L. HUDSON:

" The following cars were reloaded to-day: P. & L. E. 44266 loaded into U. P. 54568; Penn. 880730 loaded into 84136; B. & R. & P. R. 17214 into 91013; B. & O. 148928 into Pens 282402.

"(Signed)   J. DONALD, J. L. ST. ONGE.
"C. C. L.   A. Peil."

The three cars belonging to the plaintiffs appeared on both the order and the report, but not upon the line-up of July 31, 1918,

35

furnished by Griffiths & Sons to the railroad company. Miss Freedman seeing three cars of steel belonging to the plaintiffs which had been erroneously listed in the car register of the railroad company as belonging to N. K. K., allocated same to the steamship *Shingo Maru* under the line-up of July 31, 1918, for said steamship. It appears that two other cars were not reloaded in accordance with Miss Freedman's order. The net result, however, was that St. Onge provided six gondola cars to fulfill Miss Freedman's order, three of them being the three cars containing the steel of the plaintiffs, and this is where the initial error occurred.

Plaintiffs charged the defendant with the conversion of their steel:

(1) In causing the steel to be reloaded into the three gondola cars in the Oregon and Washington yards; (2) in ordering or causing to be ordered these three cars switched from the Oregon and Washington yards to Interbay; (3) in ordering the plaintiffs' steel shipped on the ocean carrier, and (4) in ordering it marked as the property of the N. K. K.

The case was tried without a jury, a jury having been waived, and a stipulation entered into that the action should be tried before the trial justice as if before a jury and that at the termination of the trial the trial justice should direct a verdict in accordance with his opinion.

At the end of the entire case plaintiffs and defendant both moved for the direction of a verdict, and thereafter the motion of the plaintiffs for the direction of a verdict was granted and a verdict directed in the amount of $73,423.50 with interest from August 30, 1918, and from the judgment entered thereon this appeal is taken.

The appellant contends that as it neither assumed nor exercised any dominion over plaintiffs' steel and acted in good faith without negligence and was in receipt of no benefit, it was not guilty of conversion.

At the time in question Erickson was the manager for defendant at Seattle. Sears was a clerk or assistant to Erickson and Semple was the person employed to mark the steel in question.

Erickson testified: " My duties were to trace and keep track of the cars arriving, to keep a record of the various details, the ground storage, to engage the space, as I have explained, and then to arrange with the steamship agents to clear the shipments as fast as possible under the instructions from New York; to take care of any other incidental matters, pay the ocean freight and secure the ocean bills of lading and dispose of it. * * * Mr. Sears was a clerk employed at that time and placed in charge of

the export business, or export matters. * * * Q. How much of the work in connection with the plates which you have been testifying about to-day was done by you, and how much was done by Mr. Sears? A. Mr. Sears did practically all of the detail work. * * * There were some cars I understand at the last that could not be found. The exact details in that respect were not handled by me, so I could not say definitely because they were handled by Mr. Sears. * * * Q. It is a fact that there was a great confusion in shipments in the Port of Seattle during 1917 and 1918? A. There was quite a bit of confusion, yes, sir."

For the purpose of the trial it was stipulated: " That during the summer and fall of 1918 there was great congestion of freight at all Puget Sound ports and particularly at Seattle which caused great delay and uncertainty in the delivery of freight by the railroads owing to war time conditions. That during this period the railroads were taken over and run by the United States government."

On June 14, 1918, the defendant employed S. E. Semple to mark the shipment of steel, viz. (as appears by the following letter in evidence, written on the letterhead of the American Express Company, Foreign Dept.):

" 805 THIRD AVE., SEATTLE, WASH.
" *June* 14, 1918.

" S. E. SEMPLE,
      ' 815 Lowman Bldg.,
            " Seattle:
            " Marking of steel plates.

" DEAR SIR.— Confirming telephone conversation to-day, we wish you to undertake to mark shipments of Steel Plates now in storage with the Oregon-Washington and Great Northern at Seattle, which we are shipping by steamers of James Griffiths & Sons from Port Commission Smith Cove Dock.

" These plates are being cleared by James Griffiths & Sons under Contracts Nos. 609 and 610, the next consignment is expected to go forward on the S. S. ' Tagosan Maru ' between June 22nd and 30th, and between 25 and 50 cars are expected to be loaded, mostly from the Oregon-Washington Yards.

" We desire that each Plate should be marked with a stroke of White Paint on the edge at one end; also that you check the number of plates turned out of each car. If you need it, we will furnish you a list of the original car numbers but as the material will all be loaded in different cars from the yards, perhaps you can accomplish your end by keeping in touch with James Griffiths & Sons when the steel is lined up for the steamer.

" Your report of marking, number of plates out of each car and total on each steamer is to be furnished us on clearance of the boat, together with bill for services rendered. This we are given to understand will be based on cost of material, plus labor at the rate of 65¢ an hour, plus supervision charge of 10%.

" Thanking you for confirmation of this arrangement, we are,

" Yours truly,<br>
" F. R. ERICKSON,<br>
" <i>Foreign Agent.</i>"

Later, early in August, 1918, at a time when the six or seven remaining cars under the N. K. K. contract could not be located, the defendant employed Semple to assist in locating the missing cars as well as to mark the steel. In Semple's bill dated September 6, 1918, rendered defendant, in addition to the items charging for services in marking the steel appears the following item:·

" Time in locating cars (Semple), $25.00."

The evidence in this case shows that after the arrangement was made with Griffiths & Sons as agents for the Mitsui Steamship Line for the shipment of the N. K. K. steel (consisting of about 150 carloads) and defendant had furnished to them and also to the railroads the original car numbers of the N. K. K. steel, the defendant ordinarily was not required to do anything further. It is admitted, however, by Erickson that in the event of trouble in getting the proper cars out for shipment it would be the duty of the defendant to see that the proper cars were released and delivered to the steamship company. Griffiths & Sons made out the " line-up " of cars as they required them for the shipment of the N. K. K. to Japan under its contract, and the railroad company recognized the " line-up " of Griffiths & Sons as an order and proceeded to furnish the N. K. K. steel as called for by reloading the steel into other cars and sending such cars to the steamer dock for shipment. The plaintiffs sought to show that defendant ordered the three cars in question to be reloaded by the railroad, it appearing from the evidence of Semple that at the request of Sears he went out to locate the N. K. K. steel in ground storage and after he made his inspection he made up a list or " clip " which he says he gave to Sears. This " clip " contains the identical cars arranged in the same manner as appears in the order sent by Miss Freedman to St. Onge and was found in the files of the railroad company in 1922. There was also found in the files of the railroad company a letter of Semple dated August 15, 1918, reading as follows:

" STANLEY E. SEMPLE CO.,
" SEATTLE, WASH., *August* 15, 1918.
" UNION PACIFIC DOCK,
" Seattle, Washington:
" Attention Mr. Lane.

" DEAR SIR.— Confirming our telephone conversation the following cars of steel plates have been loaded and I am advised by James Griffiths & Sons that they will take them on the steamer ' Kongosan.'

| | |
|---|---|
| " UP | 84136 |
| " Michigan Central | 15050 |
| " UP | 90113 |
| " BLE | 35037 |
| " Pa | 282402 |
| " UP | 96921 |

" Will you please have Argo order these cars for the ' Kongosan ' now loading at the Port Commission Dock at Smith's Cove. Advise me by telephone when cars are delivered to Northern Pacific.

" Yours very truly,
" S. E. SEMPLE."

There was no evidence as to how or when this " clip " was placed in the files of the railroad. Miss Freedman denied she ever saw the " clip," and while admitting that she had seen the Semple letter of August 15, 1918, denied that she acted on either the clip or the letter in making up the reload order sent to St. Onge. Her testimony is that the reload order was made solely because of the Griffiths & Sons' " line-up " for the steamer *Shingo Maru,* which called for cars of N. K. K. steel and she had relied solely upon the railroad register in her possession at the time in making up that reload order. She testified further that under no circumstances would she have taken or recognized the Semple letter of August fifteenth as an order to reload. It was the railroad register that showed the cars erroneously marked N. K. K. when in fact they should have been marked N. Y. K. I do not think the evidence sufficient to hold that defendant by any order or direction caused the initial error in the reload order made by Miss Freedman. I think that was clearly the fault of the railroad. It is evident, however, that at or about the time the reload order was made, Semple at the direction of the defendant was engaged with Sears in an effort to locate the N. K. K. steel. The evidence does show that later on and before these cars had reached the ship a doubt arose as to whether the steel in these cars was really N. K. K.

steel. The steamship company's agents, Griffiths & Sons, refused to put these cars on its line-up for the steamer *Taiyo Maru* until that doubt was removed, as neither the original nor reload numbers of these three cars appeared on the lists 1, 2 and 3 previously furnished to them by defendant. Thereupon Sears, Semple and Hiraoka, a representative of the N. K. K. Company, who happened to be in Seattle at the time, went out to inspect the steel. They found it in the gondola cars at Interbay. Semple says the reason for taking Hiraoka was that in the event of there being any mistake made in the identity of the steel they could " pass the buck " to Hiraoka. The steel then was in such position according to Semple that no measures could be taken nor could the weights be ascertained, a comparison of which with the weights and measures in the original papers would serve to rectify any error. The purpose of Sears in bringing Hiraoka to Interbay is stated by Semple as follows: " Mr. Sears introduced me to Hiraoka and said that they were very anxious to clean up all of this N. K. K. steel, and asked me if I would go out with them and look at it."

Also, " A. Well, we went out, as I stated, and went into the cars and endeavored to locate N. K. K. marks on the material. We found no mark whatever, and Mr. Sears and myself rather put it up to Hiroaka, because if we would go ahead and load anything on our own initiative and anything goes wrong, there is a come-back, as there was in this case, and we were kind of ' passing the buck ' to Mr. Hiraoka, but Mr. Hiraoka examined this material and he stated that it was all right and that it belonged to him, or to the N. K. K. Q. Did he make any measurements out there? A. I don't think he did. It would be a physical impossibility to measure only the top plate anyway."

Sears testified as follows: " The trip to the Great Northern yards was with Mr. Semple and Mr. Hiraoka, representing the N. K. K. for the purpose of identifying certain plates out there *concerning which there was a question in my mind as to whether they actually belonged to the N. K. K. contract.*" Also: " Q. And what did Hiraoka do when you were out there with him? A. He simply looked at the steel and took measurements of the sizes, and his opinion was that the steel belonged to the N. K. K., and asked that they be remarked and shipped. Q. At that time you had already received your report from the O. & W. as to the original numbers and the reload numbers, had you? A. Yes. * * * Semple reported there were certain cars of steel on the ground — I do not remember whether ' on the ground ' or ' on the cars ' — at Interbay that could not be identified and Semple directed Mr. Hiraoka and myself to those cars. I had no idea where the cars

were, or what the steel was. ·It was under Semple's direction. Semple went ahead and pointed out the cars while Mr. Hiraoka and myself followed through the yard."

It was after this inspection, and on August 23, 1918, that defendant wrote to the steamship agents the following letter:

(Letterhead of American Express Company, Foreign Department.)

" SEATTLE, WASH., *August* 23, 1918.

" Attention: Mr. McMahon

" (Stamped): Received Aug. 23, 1918.   Export Dept.

" JAMES GRIFFITHS & SONS, Seattle, Wash.        .

" Messrs. JAMES GRIFFITHS & SONS,

" Burke Bldg., Seattle.

" Storage Steel Clearances, S. S. ' Saikai Maru.'

" Your Contract #610

" GENTLEMEN.— Please refer to the above contract.

" A final check of our lists Nos. 1, 2 and 3, of which you have copies, indicates there should be on hand ' uncleared,' the following listed cars:

| | | | | |
|---|---|---|---|---|
| B & O | 136909 | | .....................117,525 Lbs. |
| PRR | 323224 | 38 Plates | ...........101,740 Lbs. |
| N & W | 43991 | 39 " | ..........107,335 Lbs. |
| UP | 4895 | 14 " | ..........   9,360 Lbs. |
| B & O | 237659 | 119 " | ..........  83,850 Lbs. |
| PRR | 28487 | 10 " | ..........  86,090 Lbs. |
| NYC | 338968 | 127 " | ..........109,890 Lbs. |
| PRR | 352045 | 32 " | ..........130,480 Lbs. |

" A complete check of Seattle Yards brings forth the following listed cars on hand which would seem to be the only ones we can apply against this balance:

| | | | | | | |
|---|---|---|---|---|---|---|
| UP | 96921 | ex | PRR | 28478 | 10 Plates...... | 86,090 Lbs. |
| MC | 15050 | ex | B&O | 237659 | 119 " ...... | 83,850 Lbs. |
| UP | 84136 | ex | Pa | 880730 | 25 " ...... | 97,030 Lbs. |
| UP | 91013 | ex | BR&P | 17214 | 27 " ...... | 108,135 Lbs. |
| PA | 282402 | ex | B&O | 148928 | 99 " ...... | 110,635 Lbs. |
| UP | 846290 | ex | UCR | 21790 | 111 " ...... | 162,410 Lbs. |

" You will note we have but 6 cars to apply against the balance of 8 cars appearing in our lists.   However, these 6 cars all contain N. K. K. steel, so marked, and are evidently all that remains to apply against this contract.   You will note that some of the cars listed do not appear in our lists.   We are unable·to explain this unless it is due to improper records on the part of the Railway Company conforming with transfers of Plates from car to car.

" It is our desire, therefore, that you draw bill-lading covering

the 6 cars which we have been able to locate for your S. S. ' Saikai Maru.' We will maintain at your docks a checker to carefully cover each car as placed on the steamer, in order that there will be no question as to the marks, number of pieces, weights, etc., when the time comes for us to make our adjustments covering overages and shortages.

" In placing charges on these cars, we wish to remind you of our conversation regarding the overages in the previous ladings. From our recheck we have found we have paid you at a rate of $27.50 on almost 3,700 tons while the contract at this rate provides for but 2,800 tons plus 170 tons of Steel Rails. From this you will understand the balance should be at a rate of $25.00, minus the overage on our previous ladings.

" It is our intention to recheck the former clearances with you before adjusting our charges on this last lot.

" Will you please make every effort to clear the six cars in question in your S. S. ' Saikai Maru.'

" Yours very truly,

" F. R. ERICKSON,

*Foreign Agent.*

" WKS-S

" (Stamped): In Telephoning Please call Mr. Sears."

Sears testified as to this letter: " Q. In your letter of August 23, 1918, to James Griffiths & Sons, which is Plaintiffs' Exhibit N, you say as follows: ' A complete check of Seattle yards brings forth the following listed cars on hand which would seem to be the only ones we can apply against this balance;' and then you refer to several car numbers (showing document to witness); you have already looked at that exhibit? A. Yes. Q. What do you mean when you say ' A complete check of Seattle yards?' A. Well, by someone in the employ of Semple. Semple was as much interested at that time — I don't know whether he is now or not — in the American Express Company, acting as agent for N. K. K., making quick dispatch of this steel to Japan, as we were. * * * Q. Why was that? A. Principally because Semple was under contract for a certain fee for marking these cars, and his fee was not due until he marked the cars and the stuff got on the ships; and as the result of that he would dig around in the yards here, and everybody was working together then during the congestion. It was not entirely up to one man. Semple would go out and look around and see what he could find, and I assisted by endeavoring to check from this line-up with the Union Pacific. Now that particular letter was the result of Semple's findings, and the result of my recheck of the Union Pacific, conveying to Griffiths

that that was our idea of what we were able to supply against those cars. * * * Q. So that I am safe in assuming then that when you stated to Griffiths & Sons that these cars contained N. K. K. steel, so marked, this letter must have been written — I refer to the letter of August 23, 1918 — after your examination of the plates at Interbay; was it not (showing letter to witness)? A. I believe it was, yes, sir. The statement that the cars contained N. K. K. steel was made on the basis of the statement by Mr. Hiraoka that the steel belonged to the N. K. K. * * * Q. But you did not say anything in this letter to Griffiths & Sons, that you based any such knowledge or opinion upon any such statement, did you, by Hiraoka? A. No, sir, that would not be of interest to Griffiths."

It was this letter which Griffiths & Sons required to clean up the discrepancy, if any, and to reassure them as to the identity of the steel before they would put these cars on their line-up.

McMahon, who was the man who had charge for Griffiths & Sons, testified: " Q. What happened then? A. Why, these original car numbers on these eight or ten cars were put on every line-up for a considerable length of time, several steamers after that. Q. What do you mean by the original car numbers? A. Well, the car numbers given to Griffiths & Company by the American Express Company. Q. On what list did they ·appear? A. They appeared on the original list. Q. What happened then? A. Then he substituted other cars for them later on. Q. Tell me something of the events which led up to this substitution, and state in detail. A. The express company put it up to the O. & W. Railway to · find these plates for them. Q. Were you present at any conferences with any representative of the American Express Company· and any representative of the Oregon-Washington, with reference to these cars that were in dispute? A. At one time I was. Q. Where did this controversy or discussion take place? A. At the U. P. dock. Q. Who was present at the discussion? A. Mr. Sears, and also Mr. Lane. Q. Were you there? A. Yes, I was there, and Miss Potter. Q. State the substance of the conversation with regard to these cars. A. Sears came down there with his list of cars and tried to compare them with the list that the O. & W. had down there, and they could not make any comparison as to the number of pieces or the weights, and finally there was quite an argument between Mr. Lane and Mr. Sears at that time as to which was the right cars or which were not the right cars, and so, if I recollect correctly, Sears and Lane went out to Argo to check over to find out which was right and which was wrong. * * * Q. After this argument was had in your presence, what, if anything,

did Mr. Sears tell you that he would do? A. He told me he would get the cars for me and 'phone them to me. Q. Did you hear him say anything to Mr. Lane as to what he and Mr. Lane would do in regard to locating those cars? * * * A. Yes, sir. Q. State the substance of what you heard him say to Mr. Lane at that time? A. He said they would go out to Argo and check over all the steel plates they had out there and see if they could make comparisons of any other specifications they had there at Argo unidentified to fill these orders. Q. Unidentified? A. Yes, sir. Q. Did you go out to Argo with those two gentlemen? A. I did not, no, sir. Q. Did Mr. Sears say that he would do anything, so far as you were concerned, after having gone out to the yard? A. He said he would call me up and give me the dope after he came back. Q. What next did you hear from anyone in connection with these eight or ten cars which you say were in dispute? A. A day or two later Sears called me up and gave me the car numbers to offset these eight or ten cars which were supposed to have been cleared on these contracts. Q. I show you a letter, dated August 23, 1918, and I will ask you to state what it is (showing document to witness)? A. This is a letter of confirmation. Mr. Winders: The letter speaks for itself. I admit that Sears wrote it. Q. Did you receive that letter from the American Express Company? A. Yes, sir. Q. Whose signature is that at the bottom of the letter? A. Mr. Erickson's. Q. Is that Mr. Erickson's handwriting? A. No, sir. Q. Whose handwriting is it? Mr. Winders: I will admit that Mr. Sears wrote the letter. * * * Q. Did you receive this letter from the American Express Company under date of August 23, 1918, before or subsequent to the telephone conversation in which Mr. Sears gave you the numbers of the cars? A. It was after the conversation I had with Mr. Sears. Q. What cars did Mr. Sears give you the numbers of in that telephone conversation? A. The cars on the bottom of that letter — the last six."

Also, "Q. Did Mr. Sears at this time, that is, at the time of telephoning you, make any statement to you as to where he got the numbers he was giving you? A. Not any more than he told me that that was the numbers that he and Lane checked at Argo the day they were out there. Q. Did Mr. Sears say to you whether or not he had given any instructions to the Oregon-Washington Railroad Company with regard to these six cars; if so, state what he said to you as to what instructions he gave the company? A. He said he had already notified the O. & W. to load these cars up and to hold them for the order of Griffiths & Company, to be loaded aboard the steamer. Q. After you got this letter of August

23rd from Sears, what, if anything, did you do with reference to these six cars appearing on the bottom of the first page of that letter?  A. I called up the dock and had them add it to their line-up.  Q. What dock?  A. Smith's Cove Dock.  That was where Griffiths & Company had their dock offices, on the Smith Cove Dock.  Q. Did you ever order the Oregon-Washington to take the shipments contained in these cars appearing at the bottom of the list, and put them into these cars?  A. No, sir."

Also, " Q. What did you say to them?  A. I told them to have these cars ready for a certain steamer loading on a certain date.  Q. What steamer was that, do you remember?  A. The *Taiyo Maru,* if I remember correct — they were shut out of another steamer.  Q. What steamer were they shut out of?  A. The *Saikai Maru.*  Q. Did you make a line-up of these six cars at this time?  A. Yes, sir.  Q. I show you some documents, and I will ask you just what they are (showing documents to witness)?  A. That is the line-up.  Q. Will you show me where these six cars appear on that line-up; I am referring now to the six cars at the bottom of page 1 of the letter of August 23, 1918, being Plaintiffs' Exhibit N (showing document to witness)?  A. Here is where they were 'phoned out to the dock, on this page here (pointing).  Q. I will mark that page for identification with the letter A, in a circle (does so)."

Also, " Q. And where did you get the so-called old figures originally?  A. Mr. Sears of the American Express Company.  Q. On the original checking list?  A. I could not say on the original checking list.  I did not get a comparison with that.  Here they are here (pointing), and here is the confirmation line-up I sent to the dock on August 28th (pointing).  Q. Where do these cars appear on this line-up?  A. On the bottom of the page.  Q. Are these the last six cars on that list on that page?  A. Yes, sir. * * * Q. Before you telephoned that out there and had it written on there, you had heard from both Sears and the Union Pacific?  A. Yes, sir."

The steamship company thereupon placed these cars on its line-up.  The cars were taken by the railroad to the ship's side and as the steel was taken out it was marked by Semple " N. K. K."

The evidence in the case I believe warrants the conclusion that, assuming the railroad alone was responsible for reloading the plaintiffs' steel from " ground storage " into the cars as N. K. K. steel, the fact remains that in consequence of a doubt then entertained by defendant as to the identity of the steel in those cars, Sears, Semple and Hiraoka examined it, and it was after this examination of the steel in the reloaded cars that the defendant

wrote the directions in the letter of August 23, 1918, to Griffiths & Sons to put these cars on its line-up and to make out the ocean bill of lading for this steel as N. K. K. steel. It is certain from the testimony that these three cars were never on any other line-up prior to August 28, 1918, and then appeared in the line-up of the steamer *Taiyo Maru* only because Griffiths & Sons received from the railroad the information as to these cars, to wit, that they contained N. K. K. steel, which information was confirmed by defendant by telephone and in writing in its letter of August twenty-third; and that upon receiving such information and confirmation Mr. McMahon, the shipping agent of Griffiths & Sons, caused these cars to be added in lead pencil to the line-up of that steamer. These cars subsequently reached the dock, were marked by Semple as " N. K. K." steel, as directed by defendant, and were loaded aboard the steamer as such and taken to Japan.

This in my opinion constituted the exercise of dominion by defendant over the plaintiffs' steel and constituted conversion.

It is not necessary that one should take physical possession of property to be guilty of conversion. Any wrongful exercise of dominion, by one other than the owner, is conversion. In the case of *Industrial & General Trust* v. *Tod* (170 N. Y. 233) the court said (p. 245): " Conversion at law is defined to be ' an unauthorized assumption and exercise of the right of ownership over goods, or personal chattels, belonging to another, to the alteration of their condition, or the exclusion of the owner's rights.' (Bouvier's Law Dict.) A wrongful intention is not an essential element of the conversion and it is sufficient if it appears that the owner has been deprived of his property by the defendant's unauthorized act, in assuming dominion and control. (*Boyce* v. *Brockway*, 31 N. Y. 490.) "

In *Boyce* v. *Brockway* (*supra*) certain tubs of butter belonging to plaintiffs had been delivered to the defendant, who shipped them away with butter of his own, for sale, and they had been lost. The defendant testified that he had received the plaintiffs' butter in good faith, supposing it to be his own. The jury found for plaintiffs. The judgment was affirmed. The court referring to the act of the defendant in shipping the butter as his own, said (at p. 493): " That was an assumption of dominion, which, whether founded on mistake or not, was in hostility to the ownership of the plaintiffs. The law on this subject is well settled. ' The proof,' says Brown, J., in *Cobb* v. *Dows* (9 Barb. 242) ' need not show a tortious taking, nor that the defendants acted in bad faith. If it should appear that they obtained the goods fairly from a person whom they had reason to think was the true owner, or if they

acted under a mistake as to the plaintiff's title, or under an honest but mistaken belief that the property was their own, they would still be liable to the plaintiffs, if their acts in regard to it amount to a conversion. If they have taken it into their own hands, or disposed of it to others, or exercised any dominion over it whatever, they are guilty of a conversion, and their liability to plaintiffs is established.' This exposition of the law is fully sustained by the authorities. (*Perkins* v. *Smith*, 1 Wils. 328; *Everett* v. *Coffin*, 6 Wend. 603; *Williams* v. *Merle*, 11 id. 80; *Saltus* v. *Everett*, 20 id. 267; *Hoffman* v. *Carow*, 22 id. 285; *Covill* v. *Hill*, 4 Den. 323; *Allen* v. *Crary*, 10 Wend. 349; *Murray* v. *Burling*, 10 Johns. 175; *Schroeppel* v. *Corning*, 5 Den. 240; *Connah* v. *Hale*, 23 Wend. 462.)

" A wrongful intent is not an essential element of the conversion. It is enough, in this action, that the rightful owner has been deprived of his property, by some unauthorized act of another, assuming dominion or control over it."

The fundamental test as to conversion is the assumption and exercise of dominion whether any actual interference with the property itself be involved or not.

In *Bristol* v. *Burt* (7 Johns. 254 [1810] ) Chief Justice KENT said (p. 258): " ' It is not necessary to a conversion that there should be a manual taking of the thing in question by the defendant; it is not necessary that it should be shown that he has applied it to his own use. Does he exercise a dominion over it in exclusion, or in defiance of the plaintiff's right? If he does, that is, in law, a conversion, be it for his own or another person's use.' "

In *Debobes* v. *Butterly* (210 App. Div. 50) this court held, MARTIN, J., writing: " To establish conversion it is not necessary to find a manual taking of the property or that the defendant applied it to his own use. If he exercised dominion over it to the exclusion of and in defiance of the owner's right, he is liable for a conversion."

In *Mutual Trust Co.* v. *Merchants Nat. Bank* (236 N. Y. 478 [Nov. 1923] ) CARDOZO, J., says (p. 486): " Conversion, however we define it, involves at least the element of an unauthorized *assumption of dominion* over the property of another (*Laverty* v. *Snethen*, 68 N. Y. 522, 527; Pollock Torts [10th ed.] p. 372)."

The defendant, even though acting as agent and in entire good faith, is nevertheless liable for the conversion.

It has been held without exception that wrongful intent is not a necessary element of a conversion. Nor is the fact that the defendant was acting as an agent a defense at all.

· It is stated in 38 Cyc. (at p. 2056) as follows: " That defendant was acting as agent or servant of another when he wrongfully detained or disposed of plaintiff's goods is no defense, and it is

immaterial whether he did so in ignorance of the owner's rights or in obedience to the command of his master or principal."

In *Spraights* v. *Hawley* (39 N. Y. 441) the defendant, acting as agent for one Ashby and wife, who represented themselves as the owners of certain jewelry, sold it and paid over the proceeds to the Ashbys. The defendant acted without consideration and in entire good faith. The plaintiff was entitled to the jewelry as chattel mortgagee and sued the defendant for damages in conversion. The court held the defendant liable stating (p. 446): " The agent in a tortious conversion of another's property is liable when his principal is guilty of the tort; and even though the agent act innocently in good faith. * * * "

In *Passaic Falls Throwing Co.* v. *Villeneuve-Pohl Corp.* (169 App. Div. 727) the court said by C<span>larke</span>, J. (p. 729): " Every person is liable who personally or by agent commits an act of conversion or who participates by instigating, aiding or assisting another. An agent or servant who converts the property of a third person is liable for such conversion, and it is no defense if his acts were committed in pursuance of his employment or for the benefit of his principal or master, though the servant or agent acted under a *bona fide* belief that his master or principal was the owner of the property and in ignorance of the true owner's rights, since one who interferes with personal property must at his peril see that he is protected by authority of the true owner."

Defendant gave Griffiths & Sons instructions to draw up bills of lading covering the three carloads of steel in question and to ship the steel to Japan as N. K. K. steel.

They shipped the steel to Japan under the instructions of the defendant and defendant is liable for the acts of Griffiths & Sons done pursuant to their direction.

Defendant claims error in the market value allowed by the court. Admittedly there were 161 plates weighing 315,800 pounds.

The measure of damages whether fixed at the market value in Japan or in Seattle would exceed the amount of plaintiffs' recovery as appears by the testimony of the witnesses called by plaintiffs. No evidence as to value was offered by defendant. Defendant now claims the true measure of damages was the value of the steel at the time and place of conversion, August, 1918, Seattle.

Kashiwa, one of plaintiffs' witnesses, testified that the market value of the steel at Seattle at that time was between twenty cents and thirty cents per pound. At twenty cents the value would be $63,160. At thirty cents the value would be $94,740. At an average of twenty-five cents the value would be $78,950, which is

$5,526.50 more than $73,423.50, the amount claimed by plaintiffs in their complaint, and which was allowed in the verdict. Therefore, any error in fixing the measure of damages at Japan was harmless, as it is uncontroverted that the value at Seattle was greater than the amount awarded plaintiffs.

Interest was properly allowed. " Interest is recoverable upon the value of the property from the time of conversion to the rendition of the verdict." (38 Cyc. 2090.)

The evidence supported the verdict rendered on the motion for a direction and the judgment entered thereon should be affirmed, with costs.

CLARKE, P. J., MERRELL, FINCH and MARTIN, JJ., concur.

Judgment affirmed, with costs.