## THE URKO MENDI.

### (District Court, E. D. Pennsylvania.   August 5, 1914.)

### No. 37.

1. SALVAGE (§ 9*)—NATURE OF SERVICE—RESCUE OF GROUNDED STEAMSHIP—COMPENSATION.

Respondent steamship, worth, with her cargo, $112,000, at about dead high water struck head on upon a sunken mud scow off the mouth of the Elizabeth river in Hampton Roads, where she stuck, resting upon the scow for about 20 feet of her length forward. The weather was calm, and she was in no immediate danger, although there was danger of strain as the tide fell. The crew were unable to work her off, and the code signal of distress was given, in response to which libelant's tug, worth $40,000, came to her assistance, and in less than three hours' work released her and she proceeded on her voyage. The services of the tug were at first declined but afterward accepted and were rendered promptly and with skill, but involved no more than ordinary risk. The tug offered to perform the service for a fixed price, but the offer was declined, and no price was agreed on or offered then or thereafter. *Held*, that the service was one of salvage and that libelant was entitled to an award of $500 therefor.

[Ed. Note.—For other cases, see Salvage, Cent. Dig. § 17; Dec. Dig. § 9.*]

2. SALVAGE (§ 8*)—NATURE—"DISTRESS"—"DANGER."

The "distress" and "danger" to which a ship needs to be exposed to entitle its rescuer to salvage need not be actual or immediate, or the danger imminent and absolute. It is sufficient if at the time the assistance is rendered the ship has encountered any damage or misfortune which might possibly expose her to destruction if the services were not rendered, or if a vessel is in a situation of actual apprehension though not of actual danger.

[Ed. Note.—For other cases, see Salvage, Cent. Dig. §§ 14, 15; Dec. Dig. § 8.*

For other definitions, see Words and Phrases, vol. 3, pp. 2132, 2133; vol. 2, p. 1824.]

In Admiralty.   Suit by the Southern Towing Company, owner of the tug Virginian, against the steamship Urko Mendi.   Decree for libelant.

### Findings of Facts.

The court makes the following findings:

(1) The libelant's tug, by which the salvage services claimed were performed, is of the value, with her tackle and equipment, of $40,000.

(2) The Urko Mendi, the vessel for which the salvage services were performed, is a steamship of the value of $100,000, and her cargo was of the value of $12,750. There was no testimony or evidence in the case from which the amount of the freight can be found, and it is therefore not found.

(3) The steamship struck head on and ran upon a sunken mud scow off the mouth of the Elizabeth river in Hampton Roads, near Norfolk, Va., on July 8, 1910. The steamer rested upon the scow for 20 feet of her length forward and stuck fast. The efforts of her pilot master and crew failed to get her off. She ran on the scow at nearly dead high water. The rise and fall of the tide was about three feet. The weather was clear and the sea calm, with every promise of the continuance of these conditions. She was in a position of some risk and danger of damage, however, from being subjected to the certainty of a strain if left on the scow on a falling tide.

(4) The steamer sounded the code signal of distress, and the master and crew of the tug Virginian, belonging to the libelant, went to the rescue. The offer of services was at first declined, but afterwards accepted.   A heaving

line was thrown to the steamer from the tug, and by means of this a hawser was hauled aboard the steamer and was made fast by authority of the master. The tug then worked to haul the ship free of the scow. In this she was successful, with the aid of the E. V. McCaulley, another tug. No claim is made by the latter for its services. The steamer was in condition to proceed upon her voyage. There was no evidence from which the amount of damage sustained by her can be determined, and the amount of such damage is not found.

(5) The services rendered by the tug Virginian were rendered promptly and with skill. They were, however, ordinary and involved merely ordinary risk of damage from the hawser being fouled in the propellor or from the deck housings being side-swiped by the hawser of the other tug and from the hawser being strained or chafed. A part of a new manilla hawser was chafed. The damage from this and her expenses was $100. The time of service and going and returning was less than three hours.

(6) The master and crew of the Virginian offered the service afterwards rendered at an agreed compensation. This was declined by the steamer, and the services were rendered without any agreement on the amount of compensation or price stipulated. The steamer sailed without making compensation or offer thereof and has since neither tendered nor expressed a willingness to tender compensation to libelant.

(7) So far as the same is a question of fact the court finds salvage services to have been rendered by the libelant and that salvage was earned.

(8) So far as the same is a question of fact the court finds the salvage to amount to the sum of $500.

### Conclusions of Law.

The court finds the following conclusions of law:

1. So far as the same is a question of law, the court finds the libelant to be entitled to salvage, and the amount thereof to be the sum of $500.

2. The libelant is entitled to costs.

Lewis, Adler & Laws, of Philadelphia, Pa., for libelant

Howard H. Yocum and Biddle, Paul & Jayne, both of Philadelphia, Pa., for respondent.

DICKINSON, District Judge (after stating the facts as above). We have withheld a ruling in this case until we could go over the full and elaborate paper book submitted by the respondent.

Specific findings of facts and conclusions of law are filed herewith.

This case is close to the border land between a claim for compensation for mere services rendered and a genuine claim for salvage. In attempting to find a just measure of the compensation which should be allowed and determine just how it should be applied when found, the mind feels itself to be very much of a derelict in its turn and "to be at sea without rudder or compass." The only measure we have is that in determining "the amount of salvage to be decreed there is no fixed rule nor binding precedent nor practice in admiralty." This is in the very nature of things as it must be but just as surely affords little aid to the tribunal charged with the responsibility of making the admeasurement. We further know that it may be only "a little more than remuneration pro opere et labore," and that we "may give compensation in the nature of salvage for services which fall below those necessary to found a strict salvage claim." A little more aid is given by an enumeration of some of the elements of the problem which may be considered. These observations presuppose the conclusion that in the judgment of the court the real question in this case is one of the amount of compensation. We do so regard it. The mind can, with some degree of satisfying comfort, reach conclusions on all the other questions which arise.

[1] The substantial facts are reasonably clear. The Urko Mendi, the ship concerned, is of the tramp type of steamer, and of Spanish register, and was partly loaded with coal. In leaving the port of Norfolk she "grounded" on a sunken barge or mud scow in Hampton Roads, just outside the mouth of Elizabeth river, on July 8, 1910, and stuck there. She struck on the slack water just as the tide was about to ebb. What damage she might have sustained from striking the barge or might further sustain from being hauled off was problematical. The scow was fitted with iron cleats and nigger heads, any one of which might have punched a hole in the ship's bottom. The tide at that place and at that time of year under the conditions of wind and weather then prevailing had a rise and fall of about 3½ feet. What the effect of the fall of the tide would have had is again problematical. She struck bow on with her engines going full speed ahead, but she had not at the time gained full headway. She ran her nose up over the scow so that she was pivoted at a point possibly twenty feet aft of her stem head. There was plenty of water under her stern to float her at dead low water. As her stern dropped with the tide, the effect might have been to have caused her to slide off the obstruction. If, however, she had stuck, the effect would have been to have greatly increased the strain upon her hull. Just here the court owes the amende honorable to counsel for the libelant and to his expert witnesses. The offer was made to prove by experts that the ship was in a position of danger. This impressed the court as having reference to the condition of things when she struck, and this line of testimony was open in this view of it to the criticism that the opinions of the witnesses would be merely the expression of the obvious (for instance, as one of the witnesses expressed it "it does a ship no good to run her on anything"), or it would be to express an opinion upon unknown conditions because there were no facts known as to conditions under the ship where she was fast. The tonnage of the ship, the weight of her cargo, her size, the depth of water under her forward and aft, the fall of the tide, and other facts bearing upon the amount of strain to which she would be subjected, were known, however, and the effect upon her with respect to the probable damage she would incur when the tide fell was a proper subject for the expression of expert opinion. This feature of the case was not present in the mind of the court when the offer was made. What was in mind was, as has been stated, only conditions when the ship struck.

[2] The libelant is reasonably within the facts and entitled to the finding which we have made in its favor that the ship rescued was in distress and danger. This distress need not "be actual or immediate" or the danger "imminent and absolute." "It is sufficient if at the time the assistance is rendered the ship has encountered any damage or misfortune which might possibly expose her to destruction if the services were not rendered," or "if a vessel is in a situation of actual apprehension though not of actual danger." Such apprehension as there was, however, and such danger as existed, was allayed and moderated by the facts that the season of the year; the then state of the weather, and what at that time of year it might reasonably be expected to be, were

propitious; the ship was lying fairly comfortably, and she was within easy reach of assistance. Those on the ship, however, appreciated at least the difficulties of her predicament, and, although they had not exhausted all efforts to get her off without assistance, they recognized, if not her helplessness, her need of help, for we have found that she blew distress signals. The testimony raises some question whether the signals were the code signal of distress or a private signal to another tug, but the weight of the evidence is that they were code signals, and we have so found. Another element in the case is whether the ship refused the aid proffered by the libelant.

We do not accept the proposition in its entirety as advanced by counsel for the respondent as to the right of the master of a vessel in distress to deprive salvors of their just claims by a refusal of assistance and a repudiation of their offers of help, nor do we subscribe to the doctrine laid down in some of the cases to which he has referred us.

The right of a master, however, who has a justified confidence in his ability to take care of himself and his vessel, and a well-grounded and reasonable expectation of doing so, to refuse assistance, is undoubted, and this we find to have been the right of the master of this ship This feature of the case falls out of practical consideration, however, because of the fact which we find in favor of the libelant, that the master here, although at first declining help, finally accepted of it. This acceptance was not the act of the crew without his knowledge or participation, but was that either of himself or his chief officer, done with his full knowledge and acquiescence.

The allegation of fact set up by the defense that the libelant had volunteered the service rendered, and it was accepted under an agreement that it was to be rendered for nothing, is not supported by the evidence, and we refuse to find this as the fact.

As to another of the elements in the case involving the character of the services rendered, we find them to have been of a scarcely more than ordinary and commonplace kind. There was an entire absence of the heroic, and the risks incurred were only those which confront men who follow the water in their every day avocations. They were merely the ordinary and usual risks. This applies also to the libelant's tug and her tackle. There was some possible risk of the housings above deck on the tug being side-swiped and the usual strain on hawsers and danger of chafing. A new manilla hawser was in fact chafed. All that was done was to throw a heaving line abroad the ship by which a hawser was hauled in and made fast, and then the ship pulled off into deep water by a sweeping movement of the tug and pulling from side to side. This work was, however, successful, although it should be added that she had part of the time the aid of another tug which made no claim for her services because of her relations with the ship. The whole time employed, including going and returning, was a matter of less than three hours.

It should be added that the merit of the conduct of the libelant consisted in the promptness of her act in proffering assistance and its success. No skill of seamanship beyond the ordinary was called for, but all that was called for was well performed. The tug was well handled.

The only other element in the case which need be adverted to is the value of the ship, cargo, and freight, which was removed from danger, if not actually saved, and the value of the property involved in whatever risk was incurred in rendering the service. The ship was enabled to complete her voyage and earn the freight to which she was entitled. Of the amount of the latter we have no evidence. The ship and her cargo had an admitted value of $112,750. The rescuing tug was worth about $40,000, including her tackle and equipment.

It might be added, to complete the recital of the salient facts, that the tug was kept at some expense in readiness to perform just such services as were rendered, and the further fact should be stated that no offer to compensate her has been made. This invites the observation that the ship might have kept the expense of getting her afloat within very reasonable limits by bargaining for the services of the tug, and, in the absence of any such bargain, that, if the efforts of the tug had been unsuccessful, she would have received no compensation at all. It is evident that we have in the case only the element of value upon which to found a claim for salvage of any considerable amount.

Taking everything into consideration, we have concluded to make an allowance of $500 to the libelant, together with costs. We are aware that such an award is probably open to the criticism on the part of the respondent of being an excessive allowance for the services rendered and on the part of the libelant as being inadequate salvage considering the value of property involved.