## KECK ENTERPRISES, Inc. v. BRAUN-SCHWEIGER et al.

### No. 13779.

United States District Court
S. D. California, Central Division.

Dec. 8, 1952.

---

4. Navarro v. Landon, D.C., 106 F.Supp. 73.

Jacob W. Silverman, Los Angeles, Cal., for plaintiff.

McLaughlin & Casey, Los Angeles, Cal., for defendants.

BYRNE, District Judge.

This is an action by a corporation against its president and others alleged to have acted in concert with him, for conversion of certain assets of the corporation.

Jurisdiction is invoked by reason of diversity of citizenship under the provisions of section 1332 of the Judicial Code of the United States, 28 U.S.C.A.

The plaintiff was incorporated in May, 1950, in the State of Washington for the purpose of engaging in the business of manufacturing and selling a novelty game for home use known as "Rose Bowl Football Game". With the exception of two nominal shareholders, all of the stock of the corporation was owned by the defendant, Theodore Braunschweiger, and one C. L. Keck, who is vice president of the corporation. Braunschweiger paid $20,000 for his stock, and Keck received his in consideration of the transfer to plaintiff corporation of his rights in and to the invention of the "Rose Bowl Football Game".

When the corporation started doing business, Braunschweiger drew a salary of $500 per month, and Keck a salary of $300 per month. Because of difficulty encountered in obtaining volume sales of the games as anticipated, Braunschweiger's salary was discontinued after two months and Keck's salary was discontinued after seven months. Thereafter, the corporation did not have any full-time employee, and the games were sold whenever the opportunity presented itself, which was not often enough to keep the corporation solvent. There was no established market value for the games and the periodic sales were for varying amounts. The financial condition of the corporation worsened with the passing months. What sales were made were made by Keck. Although the corporation had an account in a Seattle bank, Keck deposited the receipts from the sale of merchandise in his personal bank account. The evidence shows that practically all of these receipts were used by Keck for his personal living and sales expenses, and that in addition he loaned the corporation funds which he then used to defray his expenses. On May 23, 1951, Keck advised Braunschweiger that it appeared " * * * the best thing for me to do would be to dump the merchandise at whatever I could get out of it", and on July 30, 1951, advised that unless he had Braunschweiger's endorsed stock certificates for use in obtaining additional finances, he would sell the merchandise " * * * as a close-out for the most I can get out of it." As the condition of the corporation became increasingly hope-

less, Keck notified Braunschweiger, on August 7, 1951, that, unless Braunschweiger's stock certificates were endorsed to him, he would " * * * continue to operate as long as possible but will charge the corporation 50% of net receipts for financing and operating to liquidation of inventory".

On October 29, 1951, the corporation had 1288 dozen "Rose Bowl Football Games" remaining in stock from an original 2000 dozen manufactured. With the exception of 57 dozen stored in a Philadelphia warehouse, this remaining stock was stored at the warehouse of the defendant, Eldon Manufacturing Company. The defendant, Walter Braunschweiger, acting for his brother, Theodore, made arrangements for the sale of the 1231 dozen games stored with Eldon Manufacturing Company. The defendant, Rexall Drug Company, purchased 500 dozen at $4.80 per dozen and the remaining 731 dozen were sold to Lederer Industries of New York for $3 per dozen. The receipts from these sales, less shipping charges, were deposited by Theodore Braunschweiger in the corporation account in the Seattle bank, and thereafter a check for $675.32 was delivered to Eldon Manufacturing Company in payment of the corporation's debt for storage. The balance of the receipts, amounting to approximately $3,000, was applied on a corporation indebtedness to the Seattle bank in the principal sum of $9,000 evidenced by a promissory note. The $9,000 note of the corporation was personally guaranteed by both Keck and Theodore Braunschweiger. Braunschweiger paid the entire amount due on the note, applying $6,000 of his personal funds in addition to the $3,000 of corporation funds available.

■ Although its complaint has been drafted on the theory of an action in "trover" for conversion of the corporate property, the plaintiff has cited no authorities to support such a theory under the facts of this case. "Conversion" is a tort, and to establish it there must be a tortious act. Home v. Kramer, 7 Cal.2d 361, 60 P.2d 854. There must be an exercise of dominion over personal property to the exclusion or defiance of plaintiff's right. To constitute a conversion the acts of the defendant must be in denial of or inconsistent with the rights of the plaintiff in and to the property involved. Emmert v. United Bank & Trust Co., 14 Cal.App.2d 1, 57 P.2d 963; Gruber v. Pacific States Savings & Loan Co., 13 Cal.2d 144, 88 P.2d 137.

[2] Defendant, Theodore Braunschweiger the president, and C. L. Keck, the vice president, were the sole stockholders of the corporation. There were no salesmen or employees of any kind. If the corporation sold its inventory at all, which was the purpose for which it was formed, it necessarily would have to be done through the efforts of its officers. There can be no question of Braunschweiger's right to sell the games, but, asserts the plaintiff, the sales of 500 dozen games at $4.80 per dozen and 731 dozen at $3 per dozen were far below the actual value of the merchandise. Assuming these sales were for an amount less than the actual value of the games, this would not constitute conversion. The games were sold for and on behalf of the corporation; the receipts were deposited in the corporation bank account, and were subsequently applied to the payment of the corporation debts. The record is devoid of any evidence of conversion.

■ A careful search of the record fails to disclose any theory under which the plaintiff would be entitled to a recovery. Unquestionably, the officers of a corporation must use due care and are liable for their negligence in conducting the affairs of the corporation, but the degree of care to which they are bound is that which ordinarily prudent and diligent men would exercise under similar circumstances. Briggs v. Spaulding, 141 U.S. 132, 11 S.Ct. 924, 35 L.Ed. 662; South Penn Collieries Co. v. Sproul, 3 Cir., 52 F.2d 557. It was Braunschweiger's duty as president of the corporation to exercise such care, skill and diligence in transacting the corporate business as might be expected in his own affairs. He cannot be charged with the consequences of mismanagement unless it was so gross as to amount to fraud.

Keck had advised Braunschweiger that the condition of the corporation indicated " * * * the best thing for me to do

would be to dump the merchandise at whatever I could get out of it", and that he (Keck) would "* * * charge the corporation 50% of the net receipts for financing and operating to liquidation of inventory". There is no evidence that Keck's plans for liquidation would have resulted in additional income to the corporation. On the contrary, he planned to charge the corporation 50% of the net receipts.

Braunschweiger had a duty to obtain for the corporation the best price available at the least expense. The evidence shows that the $4.80 per dozen received from Rexall was the best price available, but Rexall would only take 500 dozen, and the only other available purchaser would pay but $3 per dozen. It is significant that the 57 dozen games in storage in a Philadelphia warehouse have never been sold or removed from the warehouse—apparently because the storage charges exceed the value of the games. It appears from the evidence that Braunschweiger's action averted a similar fate with respect to the games in question, and that he wisely salvaged such money as could be obtained for the benefit of the corporation.

The corporation received all of the receipts from the sale of the games in question, and in addition received the benefit of the payment of $6,000 from Braunschweiger's personal funds in discharging the corporation's indebtedness to the bank.

The plaintiff relies on section 3901 of the California Corporations Code, which reads: No corporation shall "sell * * * all or substantially all of its property and assets * * * [unless] Under authority * * * of its board of directors and * * * consent of (the) shareholders * * *". This section has no application where the sale is in furtherance of the business for which the corporation was organized. Jeppi v. Brockman Holding Co., 34 Cal.2d 11, 206 P.2d 847, 9 A.L.R.2d 1297. *The sole purpose for which this plaintiff corporation was organized was to manufacture and sell these "Rose Bowl Football Games", consequently such sales were in furtherance of its regular course of business and were not ultra vires transactions.*

There is an additional reason why section 3901 does not apply here. The sale of the games was not a sale of "all or substantially all of (the corporation's) property and assets". The ownership of the invention rights was the principal asset of the corporation, and is now retained by the corporation. Had these rights been sold, it would have compelled a winding up of the affairs of the corporation. The only reason the corporation is not presently manufacturing and selling games is that it cannot do so on a profitable basis.

Counsel for defendant is requested to prepare and submit findings in conformity with this memorandum.