LAMBROS SEAPLANE BASE, Inc.

v.

The BATORY et al.

GDYNIA AMERICA SHIPPING LINE, Limited

v.

LAMBROS SEAPLANE BASE, Inc.

United States District Court
S. D. New York.

Dec. 7, 1953.

---

See also D.C.N.Y. 115 F.Supp. 796.

Purdy, Lamb & Catoggio, New York City, proctors for libelant and cross-respondent; Vincent A. Catoggio, New York City, of counsel.

Haight, Deming, Gardner, Poor & Havens, New York City, proctors for claimant-respondent and cross-libelant; Richard G. Ashworth, New York City, of counsel.

IRVING R. KAUFMAN, District Judge.

This action is brought against the M/S Batory and Gdynia America Shipping Line, Ltd., by Lambros Seaplane Base, Inc., to recover for the alleged conversion of a Piper seaplane owned by libelant and picked up at sea by the Batory. The claimant-respondent denied the conversion and filed a cross-libel, praying for salvage recovery as a result of services rendered to the seaplane when it was in alleged peril and danger. A recital of the facts will aid in bringing into focus the respective legal contentions.

At about five o'clock[1] in the afternoon of August 8, 1950, when the Batory was some fifty miles from New York and twelve miles south of Fire Island, en route to Southampton, England, the Lambros seaplane approached and commenced circling the ship, signaling for assistance. After repeated circling and signaling by the plane, the ship stopped aboard. The Batory remained on the scene about fifty minutes before continuing its voyage to Southampton. Shortly thereafter, it radioed news of the incident to the Gdynia America Shipping Line, Inc. in New York, the Batory's agents here. At 7:09 P.M., more than an hour after the ship had resumed its journey, the Batory sent to the New York Times a radiogram stating that the pilot and the seaplane had been taken aboard and that the ship was continuing on its voyage. Sometime later, libelant was advised by the Coast Guard that its plane was on board the Batory.

Before the Batory reached Southampton, the libelant demanded that the plane be returned. The owners of the Batory refused unless transportation charges were paid by the libelant and stated that if such charges were not prepaid, the plane would be delivered into the custody of the Receiver of Wrecks at Southampton. The libelant did not advance the transportation costs for the return of the plane. It was delivered to the Receiver of Wrecks in accordance with English law, stored in England, and finally sold at public auction. The proceeds of the sale were exhausted by the storage charges.

The libelant asserts that the Batory unlawfully converted the seaplane to its own use and tortiously failed and refused to return it. Conversion, in the strict sense, as a basis for recovery, is questionable on the facts of the instant case. Conversion may be defined as an exercise of dominion over personal property to the exclusion or defiance of the libelant's rights. Keck Enterprises v. Braunschweiger, D.C.S.D.Cal., 1952, 108 F.Supp. 925, 927. It may be committed by acquiring possesion of goods with an intent to assert a right over them which is, in fact, adverse to that of the owner. Prosser on Torts (1941) p. 94; A.L.I. Restatement of Torts, Sections 221, 222, 223. Thus, if one sells another's property without his consent or recklessly destroys it, he may be liable for conversion. Ghen v. Rich, D.C.Mass. 1881, 8 F. 159; McKeesport Sawmill Co. v. Pennsylvania Co., C.C.Pa.1903, 122 F. 184. But some degree of intentional conduct must be found. Negligent acts

---

1. All references to Time in this Opinion are to Eastern Daylight Saving Time.

which cause loss or damage to property, while often the basis for tort liability, do not make the actor a converter. Prosser on Torts (1941) p. 100; A.L.I. Restatement of Torts, Section 224.

The libelant urges that by taking the seaplane aboard under the circumstances in this case, and carrying it to England, the Batory so flagrantly interfered with libelant's rights as to be guilty of conversion. A further discussion of the facts will assist in appraising the conduct of the Batory.

The Batory was only twelve miles south of Fire Island when the seaplane began to circle the ship and signal for help. The evidence indicates that the plane circled at least five and perhaps as many as twenty times during a period of approximately fifteen minutes. The weather was clear, the sun was shining, and the sea was relatively calm, although the Master asserts there was a haze on the horizon, and that he had approximately three miles visibility. Apart from the repeated signaling of the pilot, there was no outward manifestation that the plane was in difficulty and it twice landed easily on the water. Under these circumstances, it seems most unusual that the Captain of the Batory should have accepted so readily the pilot's explanation that he was out of gas, did not have a compass (the testimony established that the plane was equipped with a compass), had lost his orientation, and thought the Batory was an incoming ship which might take him back to shore. It is even more inconceivable that the Batory should have taken the pilot and seaplane aboard and continued its voyage of 3000 miles without any attempt to seek advice or assistance. This is especially true since it is conceded by the claimant-respondent that the Batory learned that the pilot was not the owner

of the plane before it started on its journey once again and it is likely that it had this information even before the plane was hoisted on board.[2] The Batory, as it has already been indicated, was very close to Fire Island, where a Coast Guard station was located. The aid rendered by the Coast Guard service is a matter of common knowledge. Indeed, the Master admitted that he had heard of rescues by the Coast Guard as much as 100 miles off shore.[3] Furthermore, the Batory was then in what the Master believed to be a busy lane of incoming and outgoing shipping and yet he did not so much as make an attempt to communicate with any other vessel.

The Master of the Batory was an experienced seaman who certainly recognized the alternatives to carrying the seaplane to the far distant shores of England. While it is true that he was a Pole on a Polish ship, he had been going to sea for twenty-nine years and had made approximately one hundred trips to the United States.

The messages that were sent after the Batory resumed its voyage did not correctly indicate the position of the Batory when the plane was taken aboard. They were misleading for they stated that the incident occurred "85 miles at sea" or "too far (for the plane) to reach shore." (Exhibits J and 7). Furthermore, the Captain's decision to radio news of the incident to the New York Times, more than an hour after the ship was again under way with the plane aboard, was perhaps motivated by the thought that he had better take steps to create a favorable atmosphere of publicity lest what he had done, where he had done it, and how he had done it, become the subject matter of criticism.[4]

---

2. The pilot had rented the plane that afternoon from libelant. The pilot came on board the Batory at 5:35 P.M. and was interviewed by the second Purser for about 5 minutes. The plane was hoisted on board at 5:45 P.M. (Master's examination, p. 19; Exhibit I, pp. 5, 18).

3. (Master's Examination, p. 25.)

4. The claimant-respondent urges quite properly that the propriety of its conduct should be judged not by hindsight, but by the circumstances then existing. On the other hand, claimant-respondent is using hindsight when it argues that

Hence, the self-serving radiogram to the newspaper.

The following day, for the first time, the Master examined the seaplane to determine its condition. It appears that there was, at the time the plane was picked up, more than sufficient gas to fly the plane back to land. Had the Master been diligent in his duty, he would have discovered the hoax upon him, if hoax it was, by examining promptly the fuel marker which showed approximately two inches on the stick when it was inspected by him the following day.[5]

All the circumstances considered together, cover the Batory's explanation of its actions with a mist of mystery. Its conduct under the conditions present here was most unreasonable and indeed reckless.[6]

The claimant-respondent, pressing its claim for salvage, has cited several cases as authority for the proposition that prospective salvors should be encouraged to render speedy assistance when a vessel appears in peril. This is an accurate statement of the policy of the Maritime Law, and in all the cases cited, it was quite clear that an emergency was on hand.[7] This was not apparent to the Master here in the light of all the facts and of his statement that he saw no danger. I agree that it was reasonable for the ship to stop to appraise the situation, but I do believe that it was most unreasonable under all the circumstances for the ship to hoist the plane aboard and continue its 3000 mile voyage, especially when the Purser knew, before or at least at the time the plane was hoisted onto the ship, that the pilot was not the owner of the plane. Indeed, there was sufficient to suggest to the Batory's officers a strange situation, when a pilot out in another's plane states that he is "glad to join [the] Batory's cruise to Europe" and adds "To hell with the plane". (Exhibit A; Exhibit I, p. 25).[8]

Claimant-respondent further cites cases which it urges support the contention that a salvor is entitled to recover salvage even if it is later proved that the salvage services requested were not needed. I do not quarrel with this prop-

---

it cannot be stated with certainty that the Coast Guard or an incoming ship, if radioed, would have responded. The fact is that the reasonableness of the Master's conduct can be judged by the fact that at that time he did not even attempt the communication. In short, he had no interest in whether help would be forthcoming for he did not try to obtain it.

5. The circling of the plane for about 15 minutes, the two perfect landings of the plane, the absence of any outward appearance of distress and the close proximity of the shore were enough on this clear, calm day to put the Master on guard.

6. While it is not necessary to ground my decision in this case on a finding that there was no danger or peril to the seaplane, (a condition required for salvage recovery), I am constrained to state in passing that I entertain serious doubt as to whether the seaplane was actually in danger or peril. Indeed, the Master admitted that nobody was in danger. (Exhibit I, p, 64). Of course, the claimant-respondent urges that the Batory could not be expected to linger longer in this busy sealane and that hence, once the pilot came on board, there was peril to the seaplane and other shipping. I cannot accept this explanation for the Batory had already lingered approximately 50 minutes in this busy sealane without sending a single message and it is fair to assume help was available in one form or another as close as Fire Island. Furthermore, it was not found necessary to use its radar.

7. The Elfrida, 1898, 172 U.S. 186, 19 S. Ct. 146, 43 L.Ed. 413; The Blackwell, 1869, 10 Wall. 1, 77 U.S. 1, 19 L.Ed. 870; The Star, D.C.W.D.Wash.1931, 53 F.2d 890; The Lowther Castle, D.C.N.J.1912, 195 F. 604.

8. Did it not suggest something strange that this pilot would be so readily agreeable to traveling for many days without bag or baggage, without showing concern or requesting that arrangements be made for his return to American shores, only a matter of minutes away by plane; and that the pilot would be so anxious to abandon the plane.

osition of law. But in none of the cases cited,[9] was it urged with the force urged here that the alleged salvor was negligent and reckless to the extent established here.

On libelant's technical claim of conversion, however, I do not believe that it has established that the Batory, in taking the plane aboard, acted with that degree of "deliberate intention" to convert, which must be proved, to recover under this cause of action. Nor do I believe, that if the ship was not guilty of conversion in taking the plane aboard, it became a converter by its qualified refusal to return the plane when libelant later demanded it. Restatement of Torts, supra, Section 238. The delivery of the seaplane to the Receiver of Wrecks in England, under these circumstances, would not be an act of conversion. Restatement, supra, Section 237.

I am convinced, however, that by taking the seaplane on board and carrying it to England under the circumstances already set forth, the Batory acted with such a degree of carelessness that it became responsible in damages to the libelant for such recklessness and carelessness. See Restatement, supra, Section 224.

"When a distinguishable injury has resulted from the negligence of one undertaking a salvage service, there may be not only forfeiture of all right of salvage, but an affirmative award of damages against the salving vessel." The S. C. Schenk, 6 Cir., 1907, 158 F. 54, 60.

The rule enunciated in Schenk is grounded on the general principle that even a volunteer is liable for misconduct in rendering services he has undertaken. Glanzer v. Shepard, 233 N.Y. 236, 135 N.E. 275; The Cape Race, 2 Cir., 1927, 18 F.2d 79, 81; P. Dougherty Co. v. United States, D.C.Del.1951, 97 F.Supp. 287, 292. There is no distinction between the Batory's misconduct which ultimately deprived the libelant of its property, and any negligence on the part of the Batory which might have damaged or caused loss of the plane while attempting to salvage it or return it to the United States.[10]

One other factor remains to be considered. I do not think it is a bar to my decision that the libel primarily alleges an action in conversion, while recovery is being granted to libelant on another principle of the law of torts. The terms of the libel are broad and a liberal construction is proper. Suspine v. Compania Transatlantica Centroamericana, S.A., D.C.N.Y. 1940, 37 F.Supp. 263. In any event

"It is well established in admiralty that the pleadings will be considered as amended to conform to the proof, provided that no party is surprised or injured by such course." O'Connor, Harrison & Co. v. Klingel, 9 Cir., 1926, 16 F.2d 460, 461.

See also The Roslyn, 2 Cir., 1937, 93 F.2d 278, and Admiralty Rule 23, 28 U.S. C.A. There is clearly no surprise or prejudice here, since the issue of negligence was extensively argued by both parties.

In the light of this ruling it is unnecessary for me to determine whether a seaplane may be considered a vessel and hence the subject matter of salvage. In any event, Judge McGohey passed

9. The Urko Mendi, D.C.E.D.Pa.1914, 216 F. 427; The Angie and Florence, D.C. Mass.1948, 77 F.Supp. 404; The Lowther Castle, supra; Park v. Direct Navigation Co., D.C.S.D.Tex.1918, 252 F. 837; The Apache, C.C.E.D.S.C.1903, 124 F. 905. The Sapinero, 2 Cir., 1924, 5 F.2d 56.

10. Claimant-respondent, citing Article 121 of the Polish Code of Obligations of October 27, 1933, recognizes that even under Polish law the Batory may be held responsible for gross negligence in salvaging the seaplane. Even in the light of this test, I feel that under the circumstances already related the Batory is responsible for its reckless misconduct in depriving libelant of its property.

**22**

upon this question in the affirmative on a preliminary motion in this case.

A decree will therefore be entered in favor of the libelant; the cross-libel of the claimant-respondent is dismissed.

