**CITIZENS NATIONAL BANK and Rex-Noreco, Inc., Plaintiffs,**

v.

**Michael OSETEK d/b/a Clearview Mobile Homes and Windsor Trails Corporation, Defendants.**

**No. 71 Civ. 131.**

United States District Court,
S. D. New York.

Jan. 18, 1973.

Eaton, Van Winkle & Greenspoon, New York City, for plaintiffs; Jeffrey A. Fillman, New York City, of counsel.

Stanley I. Cohen, Brooklyn, N. Y., for defendants; by Zerin, Cooper & Horlick, Brooklyn, N. Y., Ira S. Cooper, Brooklyn, N. Y., of counsel.

OPINION, FINDINGS OF FACT and CONCLUSIONS OF LAW.

LEVET, District Judge.

This is an action for conversion by Citizens National Bank (the Bank) and Rex-Noreco, Inc. (Rex-Noreco) against defendant Michael Osetek (Osetek), the sole proprietor of a retail mobile home sales operation known as Clearview Mobile Home Sales (Clearview), located in Harriman, New York, and the sole stockholder and principal officer of Windsor Trails Corporation (Windsor), which owns and operates a mobile home park (the Park) in Washingtonville, New York.[1]

The claim for conversion arose in September and November of 1970 when Osetek moved five mobile homes located in the Park to the Clearview location and then refused to allow the Bank, through its authorized agents, to repossess the homes pursuant to a first lien security interest. The Bank also has a claim for reasonable costs incurred in dispatching crews in attempts to take possession of the mobile homes.

On January 11, 1972 plaintiff commenced an action for replevin or, in the alternative, for damages for conversion of five mobile homes in which the Bank had a security interest and which the Bank had sought to foreclose. At trial plaintiff advised the court that the claim for replevin had been abandoned and that the present action is solely for damages resulting from the conversion of the mobile homes by defendant and submitted an Amended Complaint, dated October 18, 1972, deleting the prayer for relief in specie.

The defendant's Answer and Amended Answer denied the conversion, set up an affirmative defense of laches,[2] counterclaimed for amounts allegedly owed for storage of the mobile homes from the

---

1. "Plaintiff" refers to all plaintiffs; "defendant" refers to all defendants.

2. The court finds this defense to be without merit. On August 1, 1970 a cause of action for replevin of the five mobile homes arose in favor of the Bank. In September and November 1970 the conversion complained of took place. On January 11, 1971 this suit was instituted.

date defendant took possession of the mobile homes to the date of trial and for amounts allegedly owed for transporting the mobile homes to the Clearview site.

After hearing the testimony of the parties, examining the exhibits, the pleadings and the Proposed Findings of Fact and Conclusions of Law submitted by counsel, this court makes the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

1. This court has jurisdiction over the parties and the subject matter pursuant to 28 U.S.C. § 1332.

2. Plaintiff Citizens National Bank, a national banking association having its principal place of business in Englewood, New Jersey, makes loans for the purchase of mobile homes secured by a retail installment contract. Plaintiff Rex-Noreco, on behalf of the Bank, engages in the business of placing and servicing such loans. Rex-Noreco also engages in the sale of mobile homes through its subsidiary Little Britain Mobile Homes Sale Inc. (Little Britain). (36, 59–61, 70–75; [3] Exs. 1, 2, 3, 4, 5.)

3. Defendant Osetek is the sole proprietor of a mobile home sales business in Orange County, New York, under the trade name of Clearview Mobile Homes. Osetek is also the sole stockholder and principal officer of Windsor Trails Corporation, which owns and operates a mobile home park, located in Washingtonville (Orange County), New York, known as Windsor Trails Park. (8, 44–46, 107.)

4. Each of the purchasers of the mobile homes was obligated to Little Britain, pursuant to each of the respective sales contracts, to pay the original time sale amount in specified monthly payments for which Little Britain obtained a security interest in the mobile homes. Each contract and the security interest created thereby was assigned by Little Britain to the Bank promptly after each

contract came into being. (27–42; Exs. 1, 2, 3, 4, 5.) The Bank purchased from Little Britain the following retail installment contracts entered into between Little Britain and the individual purchasers of the mobile homes:

| Purchaser | Make & Serial No. | Original Time Sale Amount |
| --- | --- | --- |
| Orville Angel | 1964 Detroiter #1438 | $ 5,351.75 |
| John Barnes | 1966 Ritzcraft #3485 | $10,901.49 |
| Minetta Freeman | 1960 New Moon #0642 | $ 6,694.12 |
| George Royer | 1965 Liberty #45610 | $ 7,773.00 |
| Robert Rysdyke | 1962 Rembrant #14011 | $ 4,955.89 |
| | TOTAL........ | $35,676.25 |

(Exs. 1, 2, 3, 4, 5.)

Within ten days following the making of each contract, the Bank, having received the assignment thereof, duly filed a financing statement showing its security interest in the mobile home covered by such contract with the Office of the Orange County Clerk. (40–47; Exs. 1, 2, 3, 4, 5.)

5. Each purchaser of the mobile home maintained his home in the Park (Windsor) prior to August 1970. The land upon which each mobile home was physically located was leased by the purchaser from Windsor (Osetek) under an oral month-to-month lease. The oral month-to-month lease did not give Windsor (Osetek), as landlord, any lien or other property interest in any of the mobile homes as security for any rent or other payments due under the lease. (80–88.) I find that Windsor or Osetek, as landlord, did not acquire or obtain any lien or other property interest in any of the mobile homes as security for rent or other payments.

6. Some time in August 1970 each of the purchasers of the mobile homes defaulted in payments of installments due to the Bank under their respective retail installment contracts. (8–12, 61–75.)

7. In September 1970 Isidore Goodstein, president of Little Britain, acting on behalf of Little Britain and the Bank, advised Osetek over the telephone that he, Goodstein, would like to take

---

3. Numbers in parentheses, unless otherwise specified, refer to the stenographic minutes of the trial before this court on October 17 and 18, 1972.

possession of the mobile homes and remove them from the Park. (45, 86.)

In the telephone conversation Osetek refused to permit employees of Little Britain, as agents for the Bank, to take or obtain possession of the five mobile homes unless the sum of $1,200, representing back rent allegedly owed to Windsor by the purchasers of the five mobile homes, was first paid to Windsor by Little Britain. Goodstein offered to pay $600 to Windsor to settle the matter without litigation and advised Osetek that continued insistence by Osetek on payment of $1,200 would result in litigation pursuant to which the Bank would seek to replevy the mobile homes without the payment of any sums to Windsor. At the time of the telephone conversation Osetek knew that some bank had a first lien security interest in the mobile homes though he did not know the name of the bank. (45, 99–110.)

8. In spite of Osetek's telephonic refusal to relinquish possession of the mobile homes, Goodstein, on five occasions, sent trucks and men to the Park to attempt to repossess the mobile homes. (37–48.)

9. With the exception of the mobile home lived in by John Barnes and his family, the other four purchasers of the mobile homes ceased to occupy them shortly prior to the telephone conversation in September between Goodstein and Osetek. All five mobile homes were moved by Osetek from the Park at various times in September and November of 1970 to the mobile home sales lot (Clearview) operated by Osetek. (12, 22–28, 87–88, 107.)

10. Neither the Bank, Rex-Noreco, Little Britain nor any of the individuals who had purchased and lived in any of the mobile homes, other than the Barnes' home, had authorized Osetek to move the homes or to store the homes for them. Furthermore, Osetek caused the Barnes' mobile home to be moved from the Park to the Clearview sales lot over the objection of Mrs. Barnes (who was present at the time of removal) and without any authority from Mr. Barnes

(who was the obligor under the installment sales contract), the Bank, Rex-Noreco or Little Britain. (11–12, 26–31, 102, 131–150.) I find that defendant Osetek moved the mobile homes and held them at his Clearview sales lot on his own initiative and not pursuant to any agreement or understanding with plaintiff or its predecessors in interest.

11. Some time during November 1970 an employee of Rex-Noreco, on behalf of the Bank, and an attorney for the Bank, each demanded possession of the five mobile homes from defendant through defendant's Orange County attorney. To secure the release of the mobile homes the Bank's attorney offered to place in escrow with defendant's attorney the aggregate amount then claimed by defendant for past rent, subject to the ultimate disposition of the defendant's claims. By letter dated December 1, 1970, through their Orange County attorney, defendant rejected plaintiff's offer and again refused to give the Bank possession of the mobile homes until the total amount claimed by defendant was paid over to defendant without restriction or condition. (109, 162; Ex. 18.)

12. The provisions for the assignment of each retail installment contract by Little Britain to the Bank provided that Little Britain guarantee to the Bank, in the event of default in payments of the purchasers, payment of the unpaid balance due from each purchaser under the contract. (75–76; Exs. 1, 2, 3, 4, 5.)

In September 1970 the net unpaid balance due to the Bank from the respective purchasers of the five mobile homes (after giving the purchasers credit for unearned interest and insurance premiums) was as follows:

| | |
|---|---|
| Angel | $ 2,763.28 |
| Barnes | $ 6,313.84 |
| Freeman | $ 3,671.82 |
| Royer | $ 5,209.03 |
| Rysdyke | $ 2,976.89 |
| TOTAL | $20,934.86 |

In June 1971, pursuant to the recourse agreement, Rex-Noreco paid to the bank the sum of $20,934.86 which was due to

the Bank under the installment contracts. I find that Rex-Noreco is a proper party-plaintiff to this action.

## DAMAGES

13. In September 1970 the net unpaid balance due from the respective purchasers of the five mobile homes totalled $20,934.86. (See Finding 12.)

There is a relationship between the depreciation of each of the mobile homes and the amount of money owed to the Bank by each purchaser. If a mobile home is maintained in good condition[4] then the retail sales value of each mobile home, at any given time, would equal at least the total amount remaining to be paid by each purchaser under the installment contract. (51–52.) In such a case the measure of damages here would be $20,934.86. However, I find that there is insufficient evidence to establish the good condition of each mobile home other than the Barnes' mobile home.

Nevertheless, the "Official Mobile Homes Market Report—The Blue Book of Travel Trailers-Campers-Mobile Homes," accepted in the mobile home industry as a reliable guide to the wholesale value of mobile homes, shows that the wholesale value for the five mobile homes was as follows:

| Purchaser | Make | Blue Book Value |
|---|---|---|
| Angel | 1964 Detroiter | $ 2,065 |
| Barnes | 1966 Ritzcraft | $ 3,155 |
| Freeman | 1960 New Moon | $ 1,910 |
| Royer | 1965 Liberty | $ 2,210 |
| Rysdyke | 1962 Rembrant | $ 1,910 |
| TOTAL WHOLESALE VALUE | | $11,250 |

(Ex. 7, pp. 330, 338, 501, 622, 636.)

The retail value of a used mobile home is approximately 133% of the wholesale value as shown in the Blue Book. (52–60, 116–123.) Accordingly, I find that the total fair market retail value of the mobile homes at the time of the conversion in September and November of 1970 is $15,000.

The reasonable cost incurred by plaintiff in dispatching men and an appropriate truck to move a mobile home is $85. The reasonable costs incurred by plaintiff in five attempts to take possession of the mobile homes here was $425. (37–48; Exs. A, B, C, D, E.) Consequently, plaintiff is entitled to a total damage award of $15,425.

In summary I find that:

1. Rex-Noreco is a proper party-plaintiff.

2. Defendant, as landlord of the trailer park, did not have or acquire a lien or other property interest in any of the five mobile homes as security for rent or any other payments due under the lease.

3. Defendant in September and November of 1970 converted the five mobile homes in which plaintiff had a first lien security interest.

4. Defendant is liable in damages for conversion to the plaintiff in the amount of $15,000.

5. Plaintiff is entitled to be reimbursed in the amount of $425 which is the reasonable cost of sending men and equipment on five occasions to the Park to repossess the five mobile homes.

6. Plaintiff is entitled to a total damage award of $15,425.

7. Defendant is not entitled to any charges for storage or transportation since such took place after the conversion.

## DISCUSSION

Plaintiff seeks damages for the conversion of five mobile homes in which there is claimed a first lien security interest created by an installment sales contract.

The claim for conversion arose in September and November of 1970 when employees of defendant Osetek moved the five mobile homes from the mobile home park in Washingtonville, New York, op-

---

4. The only evidence presented to the court concerning the condition of any of the five mobile homes involved in this action establishes that the Barnes' mobile home was in good condition when ejected by the defendant in November 1970.

erated by Windsor to a sales lot in Harriman, New York, operated by Clearview.

Defendant Osetek, who is the sole proprietor of Clearview and the sole stockholder and principal officer of Windsor, claims a priority lien on the mobile homes for rent due from the purchasers of the mobile homes who maintained the homes on the Park site.

■■ The threshold question is one of priority of liens. In 1856 "The landlord's common law lien on tenant's property was abolished in New York with the abolition of the right of distress." Scott v. Browning Business Service, Inc., 175 Misc. 630, 631, 24 N.Y.S.2d 227, 228 (Mun.Ct. Manhattan 1941); see also 34 New York Jurisprudence § 344. Accordingly, the landlord "had no right to retain the goods for unpaid rent, and the detention * * * because of the plaintiff's failure to pay said rent was an unlawful act, and made the defendant guilty of conversion." Smith v. Hart, 34 Misc. 214, 215, 68 N.Y.S. 1127, 1128 (Mun.Ct. Manhattan 1901); see also Scott v. Browning Business Service, Inc., supra, 631, of 175 Misc., 228 of 24 N.Y.S. In the case at bar, within ten days following the making of each installment sales contract, the Bank, having received the assignment thereof from Little Britain, properly filed with the Office of the Orange County Clerk a requisite financing statement showing its security interest in the mobile home covered by such contract. The Bank's properly filed security interest gave it a first priority lien.[5]

■ "* * * as was said by Lord Ellenborough in Stephens v. Elwall (4 Man. & Sel. 259) 'a person is guilty of a conversion who intermeddles with my property and disposes of it. * * *'" Conner v. Long, 104 U.S. 228, 237, 26 L. Ed. 723 (1881). Indeed, "conversion may be defined as an exercise of dominion over personal property to the exclusion or defiance of the [plaintiff's] rights. Keck Enterprises v. Braunschweiger, D.C.S.D.Cal., 1952, 108 F. Supp. 925, 927. It may be committed by acquiring possession of goods with an intent to assert a right over them which is, in fact, adverse to that of the owner." Lambros Seaplane Base v. The Batory, 117 F.Supp. 16, 18 (S.D.N.Y. 1953); see, also, McKeesport Sawmill Co. v. Pennsylvania Co., 122 F.184 (3rd Cir. 1903); Ghen v. Rich, 8 F. 159 (D. C.Mass. 1881); Prosser on Torts (1964) § 15.

■ The controlling law of New York is clear that any unjustified exercise of dominion over property by one who is not the owner of the property and who is not entitled to possession of the property which interferes with the right to possession of another who is lawfully entitled to such possession is a conversion. General Electric Co. v. American Export Isbrandtsen Lines, Inc., 37 A.D.2d 959, 327 N.Y.S.2d 93 (2d Dept. 1971); Parkway Management Co. v. Wolfson, 32 A. D.2d 306, 301 N.Y.S.2d 302 (1st Dept. 1969); Suzuki v. Small, 214 App.Div. 541, 212 N.Y.S. 589 (1st Dept. 1925), aff'd, 243 N.Y. 590, 154 N.E. 618 (1926). "But some degree of intentional conduct must be found." Lambros Seaplane Base v. The Batory, supra, p. 18 of 117 F.Supp.

■ From the evidence it is clear that defendant not only interfered with the Bank's right to possession of the mobile homes but defendant actually took possession of the homes. As holder of a first lien security interest in the mobile homes, the Bank was entitled to obtain possession thereof and, accordingly, had a possessory right sufficient to support this action for conversion. The documentary evidence adduced by the Bank (Exs. 1, 2, 3, 4, 5) established that the original purchasers of the homes had entered into retail installment contracts

5. Though a mobile home may be considered a motor vehicle, as defined by the Vehicle and Traffic Law of New York, defendant's claim of a lien does not fall within the purview of Section 184 of the New York Lien Law, McKinney's Consol. Laws, c. 33.

to create a security interest in the homes in favor of Little Britain, that Little Britain had promptly assigned its rights under the contracts to the Bank and that the Bank had filed financing statements with the Clerk of Orange County within ten days following the assignment of each security interest. See Uniform Commercial Code 9–303. Furthermore, prior to any attempt on the part of the Bank to take possession of the mobile homes, the purchasers under each respective retail contract had defaulted in making payments to the Bank and in accordance with the terms of the contracts the Bank became entitled to repossess the mobile homes.

■ Osetek is individually liable for the damages incurred by the Bank together with Windsor, the corporate-defendant. The conversion was accomplished by removal of the homes from the Park owned by Windsor (Osetek, the principal stockholder and officer) to the mobile home location owned by Osetek individually under the trade name of Clearview. Osetek directed the employees who caused the homes to be moved and was the recipient of the homes after they had been so moved. Moreover, Osetek advised the Bank's agent, Goodstein, that the Bank would not be permitted to repossess the homes without payment of sums allegedly owed to Osetek by the original purchasers of the homes and it was Osetek who refused to agree to a substitution of cash as security for his alleged claims in lieu of the homes which he had seized.

In Hinkle Iron Company v. Kohn, 229 N.Y. 179, 128 N.E. 113 (1920), the New York Court of Appeals held that the president of a corporation who, with knowledge of all the facts, participated in and accomplished a conversion of money, may be individually liable for the amounts converted. See also Slavenburg Soelling Corp. v. W. A. Assomull & Co., 15 A.D.2d 645, 223 N.Y.S.2d 609 (1st Dept. 1962).

There is little doubt that Osetek's removal of the mobile homes from the trailer park to the Clearview sales location and subsequent refusal to return the homes to the Bank and Rex-Noreco constituted an intentional conversion. Consequently, defendant's claim for storage and transportation of the mobile homes is without merit.

■ In its answer to the Amended Complaint defendant asserts the frivolous contention that in June 1971, six months following the commencement of this action, Rex-Noreco paid the Bank the total unpaid balances owed to the Bank by the retail purchasers and, therefore, the defendant is exonerated from liability to the Bank caused by defendant's conversion. However, such is not the case. Section 1018 of the New York Civil Practice Law and Rules expressly provides that an action may be continued by or against the original parties upon any transfer of interest unless the court directs the person to whom the interest is transferred to be substituted or joined in the action. Accordingly, the addition or substitution of Rex-Noreco for the Bank was unnecessary but, in any event, Rex-Noreco was added as party-plaintiff pursuant to an order of this court approving the filing of the Amended Complaint.

I find that there is no prejudice to the defendant from the assignment of interest by the Bank to Rex-Noreco and that Rex-Noreco is a proper party-plaintiff. Zamochnick v. New York Central, 191 Misc. 318, 80 N.Y.S.2d 65 (Kings Co. 1948).

■ The measure of damages for conversion is the fair market value of the converted property at the time and place of conversion to which interest may be added. Ghen v. Rich, 8 F. 159 (D.C.Mass.1881); Camera Mart Inc. v. Lumbermen's Mutual Casualty Co., 58 Misc.2d 448, 294 N.Y.S.2d 941 (Civ.Ct. 1968), aff'd, 64 Misc.2d 860, 316 N.Y.S. 2d 421 (1st Dept. 1969). The evidence established that there is a relationship between the amount originally advanced by the Bank to finance the purchase of the mobile homes, the repayment sched-

ule provided for in the retail installment contracts, and the anticipated depreciation in the value of the homes so financed. Since the homes themselves constitute security for the repayment of the amounts advanced by the Bank, the Bank would not ordinarily advance money unless the amount advanced, as reduced by the required repayment, left outstanding balances equal to no more than the presumable retail values of the homes. The net unpaid balances due to the Bank from each purchaser of the five mobile homes, after giving the purchasers credit for unearned interest and insurance premiums, totaled $20,934.86. (See Finding 12.) The only evidence in the record regarding the condition of the mobile homes at the time of conversion concerned the home belonging to the Barnes and established that their mobile home was in good condition. However, this court is constrained to find, as plaintiff urges, by inference that all the other homes were in equally good condition; nor that defendant has the burden of establishing that the homes were in anything other than good condition.

However, this court does accept evidence concerning resale value of the mobile homes based upon accepted wholesale values as quoted in "The Official Mobile Home Market Report—the Blue Book of Travel Trailers-Campers-Mobile Homes," which is a standard reference used by mobile home dealers and financing institutions. The "Blue Book" establishes that the mobile homes had a fair retail market value at the date of conversion of $15,000. In the absence of any evidence controverting the values shown in the "Blue Book" I find that a damage award for conversion in the amount of $15,000 is fair and reasonable.

The reasonable cost incurred by plaintiff in dispatching men and an appropriate truck to move a mobile home is $85. The reasonable costs incurred by plaintiff in five attempts to take possession of the mobile homes was $425. Consequently, plaintiff is entitled to a total damage award of $15,425.

## CONCLUSIONS OF LAW

1. This court has jurisdiction over the parties and the subject matter of the action pursuant to 28 U.S.C. § 1332.

2. Rex-Noreco is a proper party-plaintiff.

3. Defendant as landlord of the trailer park did not have or acquire a lien or other property interest in any of the five mobile homes as security for rent or any other payments due under the lease.

4. Defendant, in September and November of 1970, converted the five mobile homes in which plaintiff had a first lien security interest.

5. Defendant is liable in damages for conversion to the plaintiff in the amount of $15,000.

6. Plaintiff is entitled to be reimbursed by defendant in the amount of $425, which is the reasonable cost of sending men and equipment on five occasions to the Park in an attempt to repossess the five mobile homes.

7. Plaintiff is entitled to a judgment with costs against defendant for $15,425 plus interest at the rate of 7½% from December 1, 1970 to September 1, 1972 and at the rate of 6% from September 1, 1972 until the date of judgment.

8. Defendant is not entitled to any charges for storage or transportation since such took place after defendant's conversion.

Settle judgment on notice pursuant hereto.